AO 91 (rev.11/11) Criminal Complaint                    AUTHORIZED AND APPROVED DATE: _____  11/24/21

# United States District Court

for the

| WESTERN | DISTRICT OF | OKLAHOMA |
| --- | --- | --- |

| | |
| --- | --- |
| UNITED STATES OF AMERICA | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| -vs- | ) |
| | )   No: M-21-674 -STE |
| MARIA JULIA BAEZA-MEDRANO, | ) |
|   a/k/a La Tia, | ) |
| JESUS IVAN BAEZA-MEDRANO, | ) |
|   a/k/a Polaco, | ) |
| CARLOS AARON BAEZA-MEDRANO, | ) |
| ALEXIS PEREZ-CAMACHO, | ) |
|   a/k/a Cholo, | ) |
| JOSE RAMON DOMINGUEZ, | ) |
|   a/k/a Golo, | ) |
| JUAN LUIS LOPEZ-CARREON, | ) |
|   a/k/a El Licenciado, | ) |
| JUAN SOTO, | ) |
|   a/k/a El Güero, | ) |
| IVAN ROY GONZALEZ-HERNANDEZ, | ) |
|   a/k/a Roy, | ) |
| KEVIN PEREZ-CAMACHO, | ) |
| ANDREA MARIE ALVAREZ, | ) |
| JOSUE ISRAEL LOPEZ, | ) |
|   a/k/a Mono, | ) |
| OMAR JOSPEH LINCOLN, | ) |
| LAVERN THOMAS, | ) |
| NANCY MORALES, | ) |
| CESAR OMAR-MERAZ, and | ) |
| DIEGO LOYA-NAJERA, | ) |
| | ) |
| Defendants. | ) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.  From in or about the date January 2020 and continuing thereafter until on or about October 26, 2021, in the Western District of Oklahoma, the defendants violated:

*Code Section*
21 U.S.C. § 846

*Offense Description*
Conspiracy to Possess with Intent to Distribute and
to Distribute 5 kilograms or more of Cocaine and 500 grams or more
of Methamphetamine

This criminal complaint is based on these facts:

See attached Affidavit of Special Agent, Tyler Rawdon, DEA which is incorporated and made a part hereof by reference.

☐ Continued on the attached sheet.

_____
*Complainant's signature*

Tyler Rawdon
Special Agent
DEA

Sworn to before me and signed in my presence.

Date: __**Nov 28, 2021**_____

_____
*Judge's signature*

City and State: Lawton ▆▆▆▆▆, Oklahoma

Shon T. Erwin, U.S . Magistrate Judge____
*Printed name and title*

2

**WESTERN DISTRICT OF OKLAHOMA**
**OKLAHOMA CITY, OKLAHOMA**

**STATE OF OKLAHOMA**     )
                                            )
**COUNTY OF OKLAHOMA** )

## AFFIDAVIT

I, Tyler T. Rawdon, a Special Agent (SA) of the Drug Enforcement Administration (DEA), being duly sworn, depose and state as follows:

1.     I am an investigative or law enforcement officer of the United States and am empowered by law to conduct investigations of, and to make arrests for, offenses as set forth in 18 U.S.C. § 2516.

2.     I have been a special agent with DEA since April 2019.  I have been in law enforcement since I became a police officer in November 2010.  After successfully completing the training academy at Fort Worth Police Department, I was assigned to the Fort Worth Police Department Patrol Division for approximately four years where I conducted countless street level narcotics investigations.  I was then assigned to the Fort Worth Police Narcotics Unit in March 2015; during this time, I regularly conducted drug investigations using different investigative techniques.  In December 2017, I was assigned to a DEA Task Force as a duly sworn Task Force Officer.  In April 2019, I was hired by the Drug Enforcement Administration and attended the four-month academy in Quantico, Virginia.  In August 2019, I was assigned to

DEA in Oklahoma City, Oklahoma, where I am assigned today. Through my training and experience, I have become familiar with the methods and operation of drug distributors, including their common organizational structures, use of violence, methods of distributing, storing, and transporting drugs, and methods of collecting and laundering drug proceeds. During my employment in law enforcement, I have received training and conducted investigations related to drugs, drug distribution, and conspiracy involving the same, in violation of Title 21, United States Code, Sections 841(a)(1) and 846. I have participated in many aspects of drug investigations, including but not limited to: surveillance, search warrants, arrests, reviewing taped conversations and drug records, and debriefing defendants, informants, and witnesses who have personal knowledge about major drug trafficking organizations.

3.     The facts set forth in this Affidavit are based upon my personal knowledge, knowledge obtained from other law enforcement personnel, review of documents related to this investigation, communications with other individuals who have personal knowledge of the events and circumstances described herein, and information gained through training and experience. Since this Affidavit is being submitted for the limited purpose of seeking a complaint and arrest warrants against the individuals named below, I have not included every fact known to me concerning this investigation. Rather I

have set forth only the facts I believe are essential to establish the foundation necessary to support the complaint and arrest warrants.

## PURPOSE OF AFFIDAVIT

4.      This Affidavit is submitted in support of a criminal complaint and arrest warrants for Maria Julia Baeza-Medrano, a/k/a "La Tia" (**JULIA**), Jesus Ivan Baeza-Medrano, a/k/a "Polaco"  (**IVAN**), Carlos Aaron Baeza-Medrano (**AARON**), Alexis Perez-Camacho, a/k/a "Cholo" (**PEREZ-CAMACHO**), Jose Ramon Dominguez, a/k/a "Golo" (**DOMINGUEZ**), Juan Luis Lopez-Carreon, a/k/a "El Licenciado" (**LOPEZ-CARREON**), Juan Soto, a/k/a "El Güero" (**SOTO**), Ivan Roy Gonzalez-Hernandez, a/k/a "Roy" (**ROY**), Kevin Perez-Camacho (**KEVIN**), Andrea Marie Alvarez (**ALVAREZ**), Josue Israel Lopez, a/k/a "Mono" (**LOPEZ**), Omar Joseph Lincoln (**LINCOLN**), Lavern Thomas (**THOMAS**), Nancy Morales (**MORALES**), Cesar Omar-Meraz (**OMAR-MERAZ**), and Diego Loya-Najera (**LOYA-NAJERA**) for their participation in a drug conspiracy—that is a conspiracy to possess with intent to distribute controlled substances, including 5 kilograms or more of a mixture or substance containing a detectable amount of cocaine and 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, both being Schedule II controlled substances, from in or about January 2020 and continuing thereafter until on or about October 26, 2021, in violation of 21 U.S.C. § 846.

3

## BACKGROUND TO INVESTIGATION

5.      A months-long DEA investigation has identified a major cocaine and methamphetamine trafficking organization—the Baeza-Medrano DTO ("the DTO")—which is headquartered in Oklahoma City and which is distributing hundreds of kilograms of methamphetamine and cocaine throughout the state of Oklahoma and elsewhere.   Information developed during this investigation indicates that the day-to-day operations of the DTO are carried out by **JULIA**, her sons **IVAN** and **AARON**, their cousins **PEREZ-CAMACHO** and **KEVIN**, as well as several Oklahoma-based associates, such as **DOMINGUEZ**, **LOPEZ-CARREON**, **SOTO**, **ALVAREZ**, and **ROY**.  The investigation established that a large part of the DTO's activities, particularly deliveries of multi-kilogram quantities of cocaine to other customers in other states, is directed by an individual residing in Chihuahua, Mexico, that law enforcement knows only as "Chuy" (CHUY LNU).  Drug couriers such as **MORALES** are responsible for transporting drugs into Oklahoma, which are then distributed by the DTO in Oklahoma and elsewhere. In fact, during the course of this investigation, law enforcement was able to identify several major out-of-state customers of the DTO, including **THOMAS** (Minnesota), **LINCOLN** (Arkansas), **OMAR-MERAZ** (Mississippi), and **LOYA-NAJERA** (Mississippi), among others.  The DTO also, however, was providing multi-kilogram quantities of methamphetamine and/or cocaine to local customers and distributors, such as **LOPEZ**, **ROY**, **SOTO**, **ALVAREZ**, and L.N.

Some of these people, such as **ROY**, also served as money-couriers for the DTO.

6.     As described at length below, **JULIA** resided at 9601 S. Indiana Ave., Oklahoma City, Oklahoma (the "Indiana Residence").  Her two sons, **AARON** and **IVAN**, as well as **PEREZ-CAMACHO**, frequented that residence, where they would store the DTO's methamphetamine and cocaine before loading it into vehicles to be transported for deliveries.  The investigation also established that the DTO used another residence as well, located at 1108 SW 49th St., Oklahoma City, to store the DTO's drugs (the "49th St. Residence").  It appears that both locations, the Indiana Residence and the 49th St. Residence, were also used to traffic firearms on behalf of the DTO.

7.     The Indiana Residence, however, was not only used to store drugs, bulk proceeds, and firearms: it housed detailed drug ledgers—maintained by **JULIA**—and bulk U.S. currency.  As discussed below, **JULIA**, **AARON**, and **IVAN** were arrested on October 26, 2021, following a traffic stop in which their vehicle was found to contain 22.85 gross kilograms of methamphetamine and 3.28 gross kilograms of cocaine.  When law enforcement executed a search warrant on the Indiana Residence later that day, they recovered $192,692.42 and approximately 9.5 kilograms of cocaine and 4 kilograms of methamphetamine, as well as drug ledgers that documented the DTO's drug trafficking up through October 2021 (the "Indiana Ledgers").  Those ledgers—which included names of co-conspirators, the amounts of drugs sold, and the amount of currency received

5

for those drug transactions—further corroborated the investigation and are discussed at length throughout this Affidavit.

8.     All told, the BAEZA-MEDRANO DTO appears to be responsible for the importation, transportation, and distribution of hundreds of kilograms of cocaine and methamphetamine in Oklahoma and other states. With that, millions of dollars per year are obtained in drug proceeds, most of which is ultimately transferred back down to Mexico by way of bulk cash smuggling.  During this investigation, law enforcement has employed a number of investigative techniques, ranging from the use of cooperating defendants and sources, to controlled buys, physical and electronic surveillance, and court-authorized wiretaps.  At every step, these techniques have shown the existence of an extensive conspiracy to distribute large amounts of cocaine and methamphetamine across Oklahoma and other parts of the country.

## FACTS ESTABLISHING PROBABLE CAUSE

9.     As stated, the investigation has been aided by Title III wiretaps.  For example, on April 2, 2021, the Honorable Claire V. Eagan, United States District Judge for the Northern District of Oklahoma, signed an Order pursuant to 18 U.S.C. § 2518, *et seq.* authorizing the interception of wire communications on telephone number (918) 508-8958, IMSI: 311480624618457, used by Manuel Gustavo Cardenas-Lozoya (CARDENAS-LOZOYA), whom investigators had identified as a Tulsa-based distributor for the DTO. Interception over

CARDENAS-LOZOYA's -8958 number began on April 2, 2021, and terminated April 30, 2021.

10.    Pursuant to those interceptions, on April 20, 2021, at approximately 4:03 p.m., CARDENAS-LOZOYA was intercepted speaking with Reinaldo Gustavo-Martinez (GUSTAVO-MARTINEZ), who was using telephone number (918) 859-4879[1] (Ref. # 1636).  During the call, GUSTAVO-MARTINEZ asks if CARDENAS-LOZOYA wants to meet "at the same business," to which CARDENAS-LOZOYA confirms, stating, "I'll see you there right at five (5:00), dude."  As shown below, the call was to set up a cocaine deal in Tulsa—made possible by **PEREZ-CAMACHO** and **LOPEZ-CARREON** delivering that cocaine from Oklahoma City.

11.    In fact, at the time of this call, **PEREZ-CAMACHO** and **LOPEZ-CARREON** were already on their way to Tulsa from Oklahoma City with the cocaine.   At approximately 3:41 p.m. on April 20, 2021, the GPS tracker on **PEREZ-CAMACHO's** black Chevrolet Cruze[2] showed the vehicle traveling eastbound on the Turner Turnpike towards Tulsa.  In response, law enforcement began to conduct physical surveillance of the vehicle as it approached Tulsa.

---

[1]    Unless otherwise noted, each intercepted call discussed herein was originally intercepted in Spanish and translated to English by DEA linguists.

[2]    On April 8, 2021, Special District Judge David A. Guten, Tulsa County District Court, signed an order authorizing the installation of GPS tracking device on this black Chevrolet Cruze, bearing Oklahoma license plate JTK077.

Further confirming that **PEREZ-CAMACHO** was traveling to the deal was the GPS ping on **PEREZ-CAMACHO's** telephone number (405) 977-9007 (the "-9007 number"), which showed him traveling with the Cruze.[3]  At approximately 5:06 p.m., law enforcement observed **PEREZ-CAMACHO's** Cruze pull into the strip mall parking lot at 1100 E. 31st St. in Tulsa.  Also observed in the parking lot was a tan Honda Odyssey bearing Oklahoma tag LGZ344—which law enforcement identified as being registered to GUSTAVO-MARTINEZ at 12821 E 13th Pl., Tulsa, Oklahoma. Parked directly next to GUSTAVO-MARTINEZ was a black Ford F-150 with a temporary license plate, which law enforcement observed to be driven by CARDENAS-LOZOYA.  As **PEREZ-CAMACHO's** Cruze parked in the lot near the Honda Odyssey and the Ford F-150, law enforcement observed CARDENAS-LOZOYA enter the rear passenger seat of the Cruze. At approximately 5:08 p.m., law enforcement observed CARDENAS-LOZOYA exit the rear passenger seat of the Cruze and enter a business north of where the Cruze was parked. Next, at approximately 5:16 p.m., CARDENAS-LOZOYA exited the business, carrying a small unidentified object in his hands, and returned to the Cruze. At approximately 5:17 p.m., CARDENAS-LOZOYA exited the Cruze and returned to his F-150 and departed the parking lot. A few minutes later, at

---

[3]     On April 7, 2021, Special Judge April Seibert, Tulsa County District Court, signed an order authorizing law enforcement to obtain GPS location data on this phone number.

approximately 5:20 p.m., law enforcement observed GUSTAVO-MARTINEZ exit the business and enter the driver's seat of the Honda Odyssey and depart the parking lot as well.  At approximately 5:28 p.m., law enforcement conducted a probable cause traffic stop with the Honda Odyssey for an improper lane change at 10100 E. 11th St., Tulsa, Oklahoma.  GUSTAVO-MARTINEZ was the sole occupant of the vehicle. During the traffic stop, the officer observed a plastic wrapped bundle on the driver's side floorboard of the vehicle, which he believed to be an illegal substance in plain view, based on his training and experience.  A probable cause search of the vehicle revealed approximately one pound of a brick of white substance believed to be powder cocaine in the vehicle. A field test was later conducted and resulted presumptive positive for cocaine.  GUSTAVO-MARTINEZ was arrested and booked into the Tulsa County Jail for state cocaine trafficking charges without incident.  It should be noted that at approximately 5:22 p.m., shortly before law enforcement pulled over GUSTAVO-MARTINEZ's vehicle, electronic surveillance showed **PEREZ-CAMACHO's** Chevrolet Cruze leaving the strip mall parking lot.  Law enforcement observed the passenger of the vehicle to be **LOPEZ-CARREON.**   Though law enforcement was unable to see the driver, I believe that person was **PEREZ-CAMACHO** given that investigators had previously identified the black Chevrolet Cruze as belonging to him and the GPS pings on his -9007 number showed it to be traveling with the black Chevrolet Cruze.   Further, that **PEREZ-CAMACHO** and **LOPEZ-**

**CARREON** had delivered the one pound of cocaine and received money for that transaction was seemingly confirmed by the Indiana Ledgers. The ledgers note that on April 22, 2021—two days after the deal—**PEREZ-CAMACHO** ("Alexis") turned in $18,000—consistent with the price of one pound of cocaine.



12.    Roughly two weeks later, **CARDENAS-LOZOYA**, **PEREZ-CAMACHO**, and **LOPEZ-CARREON** were involved in yet another deal in

Tulsa.  On May 4, 2021, at approximately 1:31 p.m., DEA Tulsa intercepted the following conversation, in which I believe **CARDENAS-LOZOYA** and **PEREZ-CAMACHO**, still using his -9007 number, discuss where they can obtain a half-kilogram of cocaine to sell (Ref. # 2863).  During the call, CARDENAS-LOZOYA asks **PEREZ-CAMACHO** about a "michelada," specifically, "How much are you going to let me have it for?"  **PEREZ-CAMACHO** answers, "Look dude, you know that Chuy doesn't give 'micheladas' to me.  I don't have any.  I have only, only, only those, whole ones, dude.  And, and I was just asked one (1) for tomorrow and I can't break it dude, because Chuy doesn't have anymore."  **PEREZ-CAMACHO** continues, "I'm going to have to get it from Betillo.  Betillo lets me have them for thirty-two (32), dude.  If not, you know that, that's why I told you, if it was the whole ones, I could lower it for you, dude.  But, you know Chuy doesn't do 'micheladas,' dude."  Based on my training, experience, and knowledge of the investigation, I believe that in this phone call between **PEREZ-CAMACHO** and CARDENAS-LOZOYA, the two are discussing the sale of a half a kilogram of cocaine (a "michelada").  I believe that initially in the conversation **PEREZ-CAMACHO** tells CARDENAS-LOZOYA that CHUY LNU does not allow his kilograms to be broken into halves and they would have to use an alternate source known as "Betillo" who would allow a half of a kilogram to be sold.  I also believe that when **PEREZ-CAMACHO** tells CARDENAS-LOZOYA that

11

a "michelada" would be the "same as it was," he was saying that the price of a half of a kilogram of cocaine would be the same as it was during past drug deals.

13.     That same day, at approximately 2:37 p.m., CARDENAS-LOZOYA again called **PEREZ-CAMACHO** at his -9007 number (Ref. # 2870) in an apparent attempt to set up the deal for a half of a kilogram of cocaine, and the two agreed to meet at 5:15 p.m. to 5:20 p.m.

14.     Then, at approximately 3:18 p.m., CARDENAS-LOZOYA once again called **PEREZ-CAMACHO** at his -9007 number (Ref. # 2875).  During this call, CARDENAS-LOZOYA said he would wait for **PEREZ-CAMACHO** at his house at 5:10 (p.m.).  **PEREZ-CAMACHO** asked if he meant at CARDENAS-LOZOYA's house, and CARDENAS-LOZOYA confirmed.  CARDENAS-LOZOYA said it would be great if **PEREZ-CAMACHO** arrived earlier because the guy was only available until 5:10 (p.m.) and worked about 40 minutes away.

15.     At approximately 4:45 p.m., law enforcement established physical surveillance at CARDENAS-LOZOYA's residence, located at 1666 S. Redbud Ave., Broken Arrow, Oklahoma. Upon arrival, law enforcement observed CARDENAS-LOZOYA's black Ford F-150, characterized by its wide off set rims and tires, bearing a paper tag dated 04/20/2021, sitting in the driveway.  At approximately 5:21 p.m., law enforcement observed a white Chevrolet Malibu, bearing an Oklahoma paper tag dated 5/01/2021, arrive at CARDENAS-LOZOYA's residence

12

and park in the driveway.[4]  Law enforcement observed **PEREZ-CAMACHO** exit the front passenger seat of the white Malibu wearing a black shirt and black hat. Additionally, law enforcement observed **LOPEZ-CARREON** exit the driver's seat of the white Malibu wearing a gray shirt and gray hat. **PEREZ-CAMACHO** and **LOPEZ-CARREON** then entered CARDENAS-LOZOYA's residence.

16.    At approximately 5:23 p.m., CARDENAS-LOZOYA received a call from M.G., who was using telephone number (918) 856-8287 and whom law enforcement believes to be GUSTAVO-MARTINEZ's cousin (Ref. # 2895).  The following is a transcript of the call.

| | |
|---|---|
| M.G.: | What do you say? |
| CARDENAS-LOZOYA: | What do you say, man? Are you this guy's relative, the one of the "gorditas?" |
| M.G.: | Yes. Yes. The cousin. |
| CARDENAS-LOZOYA: | Alright. Yes, yes, man. Perfect. |
| M.G.: | Yes. He (MARTINEZ)[5] told me to give you a call to see how we could get in agreement. |
| CARDENAS-LOZOYA: | Alright. No, well, let's go there to, to… if you want… you know how there's a place |

---

[4]    The paper tag would later be replaced with a permanent license plate, Oklahoma tag KZY364, which was registered to **PEREZ-CAMACHO** at 3706 S. Pennsylvania, Apartment # 213, Oklahoma City, OK 73119.

[5]    I believe that when M.G. said he had spoken with another person about this meeting, he was referring to his cousin MARTINEZ—who bonded out of jail following his April 20, 2021 arrest.

|                    |                                                              |
|--------------------|--------------------------------------------------------------|
|                    | where they sell snacks by where this guy is?                 |
| M.G.:              | Uh huh. Yes. Yes.                                            |
| CARDENAS-LOZOYA:   | There, right there. I'll head over.                          |
| M.G.:              | Alright, then.                                              |
| CARDENAS-LOZOYA:   | Alright then, man. I'll, I'll give you a call when . . .      |
| M.G.:              | Alright, I…                                                  |
| CARDENAS-LOZOYA:   | In how long will you arrive there?                          |
| M.G.:              | I said that in about fifteen (15) or twenty (20), depending. |
| CARDENAS-LOZOYA:   | Oh . . .                                                     |
| M.G.:              | I'm already on my way.                                       |
| CARDENAS-LOZOYA:   | Alright, then. If you want, I'll see you there in twenty (20) so we don't bullshit. |
| M.G.:              | Alright. Set.                                                |
| CARDENAS-LOZOYA:   | Alright.                                                     |

17.     At approximately 5:45 p.m., CARDENAS-LOZOYA and M.G. again spoke by phone (Ref. # 2897).  CARDENAS-LOZOYA asked what kind of car M.G. was driving.  M.G. said a gray Nissan. Meanwhile, law enforcement observed CARDENAS-LOZOYA, **PEREZ-CAMACHO**, and **LOPEZ-CARREON** exit CARDENAS-LOZOYA's residence. **LOPEZ-CARREON** then entered the driver's seat of the white Chevy Malibu. Law enforcement also observed CARDENAS-LOZOYA enter the driver's seat of his black Ford F-150 and **PEREZ-CAMACHO**

14

enter the front passenger seat of the vehicle, carrying a small brown paper sack.

18.     Subsequently, law enforcement established physical surveillance at Snacks Morelos, located at 10915 E. 31st St., Tulsa, Oklahoma. At that time, law enforcement observed a silver Nissan Altima bearing Oklahoma tag CLL810 parked in the parking lot.

19.     At approximately 6:01 p.m., law enforcement observed the black Ford F-150 and white Chevy Malibu arrive in the parking lot located at 10915 E. 31st St.  Upon arrival, law enforcement observed CARDENAS-LOZOYA park his black Ford F-150 next to the silver Nissan Altima. At that time, CARDENAS-LOZOYA exited the black Ford F-150 and placed an object into the front passenger seat of the silver Nissan Altima.  CARDENAS-LOZOYA proceeded to enter back into the driver's seat of the black Ford F-150 and drive around the parking lot multiple times before eventually parking next to PEREZ-CAMACHO's white Malibu.

20.     Following the meeting with CARDENAS-LOZOYA, law enforcement observed M.G. reposition the silver Nissan Altima in the parking lot. Law enforcement observed M.G. exit the driver's seat of the silver Nissan Altima and place a brown paper sack in the trunk of the vehicle.  Moments later, M.G. entered back into the driver's seat of the silver Nissan Altima and departed from the area.

21.     Based on my training, experience, and knowledge of this investigation, I believe that the brown paper sack observed contained the half-kilogram of cocaine ("michelada") that M.G. was expecting and that **PEREZ-**

15

**CAMACHO** and **LOPEZ-CARREON** brought the half-kilogram of cocaine from Oklahoma City for CARDENAS-LOZOYA to complete the drug transaction with M.G. I believe that once the transaction was complete, M.G. placed the brown paper sack containing the cocaine in the trunk in order to hide the cocaine from law enforcement should he be subject to a traffic stop.

22. Law enforcement in the Western District of Oklahoma would soon obtain a Title III wiretap. On July 15, 2021, the Honorable Timothy D. DeGiusti, United States Chief District Judge for the Western District of Oklahoma, signed an Order pursuant to 18 U.S.C. § 2518, *et seq.* authorizing the interception of wire and electronic communications over (213) 984-3355 (TT1), used by **PEREZ-CAMACHO**.

23. As stated previously, **PEREZ-CAMACHO** was often tasked with delivering kilogram-quantities of cocaine to out-of-state customers. One such trip occurred on July 20, 2021, to **LINCOLN** in Arkansas. That day, the GPS ping on TT1[6] and the GPS tracker on **PEREZ-CAMACHO's** maroon Chrysler 200[7]

---

[6] On July 8, 2021, United States Magistrate Judge Gary M. Purcell, Western District of Oklahoma, granted the order authorizing the collection of GPS ping data for TT1.

[7] The maroon Chrysler 200, which bore Oklahoma license plate KZY895, is registered to **PEREZ-CAMACHO** at 3706 S. Pennsylvania Ave., Apt. # 213, Oklahoma City, Oklahoma. On July 16, 2021, United States Magistrate Judge Gary M. Purcell, Western District of Oklahoma, authorized the installation and monitoring of a GPS tracking device on this vehicle.

showed him traveling directly from Oklahoma City to Benton, Arkansas. At approximately 7:56 a.m., **PEREZ-CAMACHO** sent a text message to **LINCOLN** at (432) 251-7467: "Can you send me the address bro" (TT1 Ref. # 240). **LINCOLN** responded at approximately 8:53 a.m., "2498 pleasant Willow" (TT1 Ref. # 243). The Chrysler 200 did not go to 2498 Pleasant Willow Dr., however; the GPS tracker data placed it at 2484 Pleasant Willow Dr., where the garage door was closed, and it appeared that **LINCOLN** had sent the incorrect address. And in fact, law enforcement databases connected **LINCOLN** to the 2484 address, not the 2498 address. The two then continued to coordinate by phone. At approximately 9:24 a.m., **PEREZ-CAMACHO** placed a call to **LINCOLN** (TT1 Ref. # 248). **LINCOLN** tells **PEREZ-CAMACHO**, "I hear you. The things is out there, bro. The rent." **PEREZ-CAMACHO** responds, "Yeah, um, I'm here." **LINCOLN** then tells **PEREZ-CAMACHO**, "Yeah, go ahead and grab the rent and do what you need to do." Based on my training, experience, and knowledge of the investigation, I believe **LINCOLN** was telling **PEREZ-CAMACHO** that the bulk currency was in the garage ("out there") and that he should proceed to access the hidden compartment in his vehicle ("do what you need to do") in order to get the cocaine for the deal. It appears that **PEREZ-CAMACHO** did just this, because he sent a text message at 9:39 a.m. to **LINCOLN** that read simply, "Done

bro" (TT1 Ref. # 251).[8]

24.    There apparently was an issue with **LINCOLN's** payment, however, because **PEREZ-CAMACHO** placed an outgoing call (TT1 Ref. # 255) to CHUY LNU at 52-639-167-8513 at approximately 9:45 a.m.  This call was intercepted in Spanish and translated to English by DEA linguists.

| | |
|---|---|
| **PEREZ-CAMACHO**: | What, what's up my Chuy? Listen, I'm here with the guy, um, he's telling, telling me that he's not going, he's not going to take the money to, to… |
| CHUY LNU: | Well tell him that I was told… |
| **PEREZ-CAMACHO**: | Excuse me, what did you say? |
| CHUY LNU: | Tell him… [Tell] him that the one I talk to, that's how he told me, right. |
| **PEREZ-CAMACHO**: | I did [tell him] that. That's what, that's what I told him. That I was told… |

---

[8]    Intercepts and accompanying surveillance throughout the investigation established that **PEREZ-CAMACHO's** Chrysler 200 contains hidden compartments.  For example, in one phone call between **JULIA** and CHUY LNU (TT2 Ref. # 165), **JULIA** tells CHUY LNU that the "devices" (kilograms of cocaine) were filled with water.  CHUY LNU tells her to ask **PEREZ-CAMACHO** why "they" (the kilograms of cocaine) arrived wet, and CHUY LNU goes on to say that he does not remember that "trap" very well, so **PEREZ-CAMACHO** would have to explain how they could have gotten wet.  Similarly, **PEREZ-CAMACHO** and **IVAN** were intercepted over TT1 (TT1 Ref. # 629) discussing "loading five" into the vehicle at **JULIA's** residence.  The fact that after this call **PEREZ-CAMACHO** then arrived to **JULIA's** residence in his Chrysler 200 and—as he always does—pulled into the garage and shut the garage door behind him further corroborates law enforcement's belief that the vehicle contains hidden compartments used to transport drugs and bulk currency.

| | |
|---|---|
| CHUY LNU: | Uh-huh. |
| **PEREZ-CAMACHO**: | … they told me… |
| CHUY LNU: | But look, [unintelligible]. |
| **PEREZ-CAMACHO**: | I'm not, I'm not taking the money over there. |
| CHUY LNU: | But ask him, ask him what time, what time he will have the money tomorrow. |
| **PEREZ-CAMACHO**: | [*Aside*: Hey bro, what time are you going to have the money for tomorrow? In the morning? Like at what time? All right.] |
| | He said, said that about eight (8:00) or nine (9:00) tomorrow morning. |
| CHUY LNU: | Oh, no. Tell him, tell him that you will wait then. |

**PEREZ-CAMACHO** continued, explaining that "[h]e gave me ninety-five" ($95,000) and that "tomorrow I will put up . . . I'm going to put up ninety-five" ($95,000). CHUY LNU then asked, "With the works?" **PEREZ-CAMACHO** responded, "[i]n the meantime, I will put up the ninety-five ($95,000)." CHUY LNU then instructs him to "put that up" and asks whether "he" (**LINCOLN**) was going to give him the rest of the money later." **PEREZ-CAMACHO** confirms, saying that "he" (**LINCOLN**) would be giving him "one hundred" ($100,000) more.

**PEREZ-CAMACHO** stated he would be in contact, and the call concluded. Shortly after this, law enforcement observed the Chrysler 200 pull out of the garage at 2484 Willow Dr. They also observed **LINCOLN** leave the residence

shortly thereafter.   That **PEREZ-CAMACHO** had delivered 6 kilograms of cocaine and received approximately $195,000 from **LINCOLN** was confirmed by the Indiana Ledgers.   One page from the ledgers confirms that **PEREZ-CAMACHO** was given "6" on July 19, 2021.



Moreover, another page confirmed that **PEREZ-CAMACHO** delivered $194,970 to **JULIA** on July 21, 2021.



25.   In fact, it appears this was not the first time that **PEREZ-CAMACHO** had delivered 6 kilograms of cocaine to **LINCOLN** in Arkansas.  For example, another page from the ledgers notes that **PEREZ-CAMACHO** received "6 F" for Arkansas around June 16, 2021.  As described herein, this organization has sometimes referred to kilograms of cocaine as *las finas*, Spanish for the "fine ones."  I believe that the ledgers therefore show that **PEREZ-CAMACHO** received six *finas,* i.e., six kilograms of cocaine, on June 16, 2021, that he

21

ultimately delivered to **LINCOLN** in Arkansas.



Furthermore, I believe that the six kilograms of cocaine were ultimately delivered to **LINCOLN** on June 18, 2021, because toll data on **TT1** shows that **PEREZ-CAMACHO** was in contact with **LINCOLN's** -7467 number 16 times between June 16 and June 18, 2021.  The Indiana Ledgers also show that while **PEREZ-CAMACHO** was in Arkansas on June 18, 2021, he purchased car ramps for $44 from a Walmart in Fort Smith.  And it also appears that the $44 was then subtracted from the $100,000 that **LINCOLN** paid **PEREZ-CAMACHO**.  As explained *infra*, those car ramps appear to be helpful in unloading cocaine from the hidden compartment contained in the Chrysler 200.



26.     **PEREZ-CAMACHO** would soon make yet another cocaine delivery, this time for five kilograms to **THOMAS** in Minnesota on July 26, 2021. First, however, **PEREZ-CAMACHO** had to ensure the cocaine was loaded into his vehicle for the cross-country trek. The coordination for that began on July 25,

23

2021, when **PEREZ-CAMACHO** received an incoming call from **IVAN**, using (405) 625-9052, at approximately 3:07 p.m. (TT1 Ref. # 629).  During this call, **PEREZ-CAMACHO** and **IVAN** confirm that they have both spoken to "Jesus." (Because "Chuy" is a common moniker for "Jesus," I believe the two were referring to CHUY LNU.)  **PEREZ-CAMACHO** then asks **IVAN**, "Should we load it now?" **IVAN** asks **PEREZ-CAMACHO** to confirm, and **PEREZ-CAMACHO** once again asks, "Should we load now or should I go to Aaron's?"  As the conversation continues, both individuals confirm that "five" will be loaded.  Based on my training, experience, and knowledge of the investigation, I believe that they are discussing loading five kilograms of cocaine into the hidden compartment in **PEREZ-CAMACHO's** Chrysler 200—cocaine which was being kept at the Indiana Residence.  As explained below, it appears that the two individuals did in fact load the cocaine later that day.

27.    But before they loaded the cocaine, on July 25 at 3:48 p.m., there was a follow-up call from **AARON**, using phone number (405) 625-6871, to **PEREZ-CAMACHO** discussing the deal (TT1 Ref. # 637).  During the call, **PEREZ-CAMACHO** asks **AARON** if **IVAN** has called him, explaining that he (**PEREZ-CAMACHO**) needs "five (5) of the cars."   **AARON** then tells **PEREZ-CAMACHO**, "my mom and I just left dude, since we thought there would not be anything." **PEREZ-CAMACHO** then tells **AARON**, "At around five (5:00) or six (6:00), once you get back, give me a little call. It's no, no, no problem."  **AARON**

agrees, and the two refer to each other as "cousin" before the call concludes.  Based on my training, experience, and knowledge of the investigation, I believe that **PEREZ-CAMACHO** is referring to five kilograms of cocaine when he says "five of the cars."[9]  **AARON** also states that he just went to the mall with his mother.  And in fact, not long after, law enforcement observed **AARON** and **JULIA** leave the outlet malls located at I-40 and Council Rd. and return to the Indiana Residence.  And shortly after this—just as **PEREZ-CAMACHO** and **IVAN** had discussed—investigators observed **PEREZ-CAMACHO** arrive at the Indiana Residence, pull his vehicle into the garage and shut the garage door behind him.

28.     It was soon evident why **PEREZ-CAMACHO** needed to obtain the five kilograms of cocaine: he had a customer (**THOMAS**) waiting in Minnesota for a delivery the next day, July 26.  At approximately 3:29 a.m. on July 26, the tracker on **PEREZ-CAMACHO's** Chrysler 200 showed it leaving his apartment located at 3706 S. Pennsylvania Ave. and begin traveling northbound out of Oklahoma City. By approximately 5:07 p.m. the tracker showed the Chrysler 200 in Minneapolis, Minnesota, where local law enforcement was able to conduct physical surveillance on the vehicle.  Law enforcement did not intercept any

---

[9]     Throughout wire intercepts, **PEREZ-CAMACHO** has used the word "car" to refer to what law enforcement believes is a kilogram of cocaine.  As for **PEREZ-CAMACHO's** and **AARON's** use of the word "cousin," it appears that **PEREZ-CAMACHO** is **IVAN's** and **AARON's** cousin, which would be consistent with **PEREZ-CAMACHO's** regular references to **JULIA** as his "aunt" during intercepted calls.

communications over TT1 coordinating with the customer in Minnesota. The WhatsApp pen register on TT1, however, showed several messages prior to 6:00 p.m. with the phone number (612) 701-8544—which law enforcement databases connect to **THOMAS**. Upon **PEREZ-CAMACHO's** arrival to the apartment complex at 2323 26th Ave. N. Minneapolis, Minnesota, **PEREZ-CAMACHO's** Chrysler 200 and a Chevy Tahoe—bearing Minnesota license plate EFE4399, also registered to **THOMAS**—drove in tandem to the apartment complex's underground parking garage.

29.    Not quite an hour later, at approximately 5:59 p.m., **PEREZ-CAMACHO** placed an outgoing call using TT1 (TT1 Ref. # 712) to CHUY LNU at his -8513 number, the purpose of which was to confirm that he had delivered the five kilograms of cocaine to the customer in Minneapolis. The call begins with **PEREZ-CAMACHO** first advising CHUY LNU that he gave "everything" (i.e., the five kilograms of cocaine loaded into the Chrysler 200 the day prior) to the "black guy" (**THOMAS**) and that he was going to rent a room. CHUY LNU then tells **PEREZ-CAMACHO,** "[y]es, yes, look. Rest because it's, it's convenient . . . it's convenient for them to give us whatever they are going to give us, because if not . . . it's going to be a wasted trip." Based on my training, experience, and knowledge of the investigation, I believe that in this call, CHUY LNU was directing **PEREZ-CAMACHO** to wait to receive payment from **THOMAS**. CHUY LNU then tells **PEREZ-CAMACHO** that he needed him to continue his

trip early the next morning to either Columbus, Ohio, or Burlington, North Carolina, to collect an additional amount of bulk cash to be returned. **PEREZ-CAMACHO** agrees and asks **CHUY LNU** to confirm the location once he is sure. **CHUY LNU** then asks if it was "six"? **PEREZ-CAMACHO** corrects him and states that was "five," explaining that "Ivan only put five in there."

30.     That **PEREZ-CAMACHO** had in fact delivered five kilograms to **THOMAS** was confirmed the next day, July 27. That day, law enforcement witnessed an unidentified male arrive at **THOMAS's** apartment, stay for a short time, and then leave. Law enforcement then executed a search warrant on **THOMAS's** apartment—where they identified the resident as **THOMAS**—and located four kilograms of cocaine and approximately $10,000 in U.S. currency. **THOMAS** appears to have sold one kilogram to the unidentified male prior to execution of the search warrant. Further, the Indiana Ledgers corroborated that **PEREZ-CAMACHO** had been given five kilograms of cocaine on July 25 to deliver to **THOMAS**. They indicate that **PEREZ-CAMACHO** was given "5 F" (five *finas*), i.e., five kilograms of cocaine, for Minnesota on July 25, 2021.



31.    Law enforcement continued to monitor **PEREZ-CAMACHO's** movements after leaving Minnesota.  On July 28, at approximately 1:21 a.m., the GPS ping on TT1 placed **PEREZ-CAMACHO** near a Motel 6 in Burlington, North Carolina—just as **PEREZ-CAMACHO** and CHUY LNU had discussed during their July 26 call (TT1 Ref. # 712).  Later that morning, at approximately 10:34 a.m., **PEREZ-CAMACHO** placed an outgoing call (**TT1** Ref. # 823) to CHUY LNU at 52-639-167-8513 in order to confirm that he had picked up bulk cash.  At the beginning of this call, **PEREZ-CAMACHO** tells CHUY LNU, "I already met with this guy."  **PEREZ-CAMACHO** then confirms with CHUY LNU that it was "one hundred forty-five."  Investigators believe **PEREZ-CAMACHO** is referring to $145,000, based on **CHUY LNU** previously instructing **PEREZ-CAMACHO**— while he was still in Minnesota—that he would be collecting additional bulk cash in either Columbus, Ohio, or Burlington, North Carolina.  Later on in the call, **PEREZ-CAMACHO** tells **CHUY LNU**, "[I]'m just going to buy the ramps, and then I'm going, I'm going to head over there. I will let you know once everything is

put up, if you want?"  Law enforcement was then able to conduct physical surveillance on **PEREZ-CAMACHO** as he went to a nearby auto parts store.  As stated previously, I believe that **PEREZ-CAMACHO** used these ramps to prop up the Chrysler 200 in order to access the vehicle's hidden compartment, this time to load the $145,000 he had received from his co-conspirator in Burlington, North Carolina.

32.     **PEREZ-CAMACHO**, however, did not make this trip to Minnesota and North Carolina by himself.  **DOMINGUEZ** had traveled with **PEREZ-CAMACHO**.  In fact, law enforcement captured photos of both individuals at a Motel 6, located at 978 Plantation Dr., Burlington, North Carolina.  It appears that the $145,000 collected by the two individuals in North Carolina was then delivered to **JULIA** on July 29, 2021, as the Indiana Ledges reflect **PEREZ-CAMACHO** deposited "145K"—or $145,000 with **JULIA**.



33.     These trips were not out of the ordinary for **PEREZ-CAMACHO**.  In

29

fact, during a call on July 30, 2021, **PEREZ-CAMACHO** discussed all of his recent drug deliveries with CHUY LNU.  That day, at approximately 9:57 a.m., **PEREZ-CAMACHO** placed an outgoing call (TT1 Ref. # 975) to CHUY LNU at his -8513 number.  During this call **PEREZ-CAMACHO** and CHUY LNU review the sales from **PEREZ-CAMACHO's** trips.  At the beginning of this conversation CHUY LNU asks **PEREZ-CAMACHO** to report the numbers that **PEREZ-CAMACHO** has calculated for himself.  **PEREZ-CAMACHO** begins by listing for CHUY LNU the trips that he has already been paid for, explaining that he had already been paid "seventeen bucks" ($17,000) for the trips he made to Memphis, Little Rock, Amarillo, and Ohio.  **PEREZ-CAMACHO** continues, stating, "I said, the, the first trip, the first trip was six (6), six (6) Memphis, right?" Later in the conversation, **PEREZ-CAMACHO** tells **CHUY LNU**, "Yes, and then six (6) to Arkansas. Four (4) to Amarillo. Six (6) Ohio." Based on my training, experience, and knowledge of this investigation, I believe **PEREZ-CAMACHO** is confirming with **CHUY LNU** that he took six kilograms of cocaine to Memphis, six kilograms of cocaine to Arkansas, four kilograms of cocaine to Amarillo, and six kilograms of cocaine to Ohio.

34.   The July 30 call (TT1 Ref. # 975), however, was not over, as **PEREZ-CAMACHO** and CHUY LNU then discussed the trips that **PEREZ-CAMACHO** had not been paid for.

**PEREZ-CAMACHO**:        And then, well the ones that are pending are six (6) Arkansas.

CHUY LNU:                Arkansas?

**PEREZ-CAMACHO**:        Uh-huh. Six (6) Ohio.

CHUY LNU:                Who did you go to in Arkansas? Do you remember?

**PEREZ-CAMACHO**:        I'm sorry, what?

CHUY LNU:                Who did you go to in Arkansas? Do you remember?

**PEREZ-CAMACHO**:        The black guy.

CHUY LNU:                Oh, yes, yes.

**PEREZ-CAMACHO**:        Yes, yes, yes.

CHUY LNU:                I have, I put "Little" [PH] on there. The name is "Little" [PH], no?

**PEREZ-CAMACHO**:        Yes, yes. That's it sir, that's it. It's Little Rock.

CHUY LNU:                It's Little Rock?

**PEREZ-CAMACHO**:        Uh-huh, yes.

CHUY LNU:                Go ahead, what else?

**PEREZ-CAMACHO**:        And then six (6), uh, six (6) Ohio.

CHUY LNU:                Six in (6) Ohio?

**PEREZ-CAMACHO**:        Uh-huh, and then again. Six (6) Ohio. Six (6) Columbus, Ohio.

CHUY LNU:                Correct.

31

| | |
|---|---|
| **PEREZ-CAMACHO**: | Uh-huh, and then again, uh, six (6) Memphis. |
| CHUY LNU: | Memphis? |
| **PEREZ-CAMACHO**: | Uh-huh… and then again, six (6) Memphis. |
| CHUY LNU: | Memphis, yes. |

All of these trips, the quantities of drugs delivered, and the fact that **PEREZ-CAMACHO** had been paid $17,000 for his first four trips, were ultimately corroborated by the Indiana Ledgers.



35.     Finally, in the latter part of the July 30 call (TT1 Ref. # 975), **PEREZ-CAMACHO** states that he delivered another "six (6) Arkansas, uh, to Little Rock."

He then references his five-kilogram delivery to Minnesota, as well as the fact that law enforcement ultimately seized cocaine from **THOMAS**, along with the fact that he had in fact picked up $145,000 in Burlington, North Carolina:

| | |
|---|---|
| **PEREZ-CAMACHO**: | Uh-huh, and then five (5) Minnesota. There, I don't know how you are, I, I, I don't know what, my Chuy I don't know if with the problem there was, I don't know. I couldn't do anything about that, I don't know, right? I don't know if… |
| CHUY LNU: | Okay. |
| **PEREZ-CAMACHO**: | Uh, and then it was the one hundred forty-five (145) of the, of the money pick up. I don't know what's up with that either what's up. |
| CHUY LNU: | Of the what? |
| **PEREZ-CAMACHO**: | Of the, of the money pick up from over there, from Burlington. Where I went, to, to North Carolina. |

Based on my training, experience, and knowledge of this investigation—derived from GPS tracker data on TT1, **PEREZ-CAMACHO's** Chrysler 200, the intercepted calls, and the Indiana Ledgers—I believe that **PEREZ-CAMACHO**, along with **DOMINGUEZ**, at the behest of **CHUY LNU**, had traveled to Arkansas, North Carolina, Ohio, Memphis, and Minnesota to distribute cocaine and/or collect proceeds from previous drug deals.

36.   As previously stated, the DTO did not solely traffic cocaine; it also trafficked methamphetamine.  For example, in August of 2021, a confidential

human source (CS1) placed an undercover officer (UC1) in contact with H.A., a methamphetamine source, via phone.  On August 11, 2021, UC1 contacted H.A. to inquire about purchasing one kilogram of methamphetamine from H.A.  H.A. advised UC1 that his (H.A's) buddy was busy at the moment but he (H.A.) would call UC1 back.

37.     Shortly after, H.A. contacted UC1 and advised that H.A.'s buddy would be available to conduct the one-kilogram deal between 5 and 6 p.m. that day.   UC1 then provided H.A. with a pre-determined meeting location in Oklahoma City.

38.     Law enforcement then established surveillance in the vicinity of the pre-determined meeting location in anticipation of the meeting with H.A.'s methamphetamine contact. While en route to the pre-determined meeting location, H.A. contacted UC1 and informed him that H.A.'s buddy would be driving a Dodge or a sedan.

39.     Subsequent to arriving at the parking lot of the pre-determined meeting location, UC1 observed **IVAN's** dark colored Dodge Ram truck bearing Oklahoma license plate KEV839 behind his vehicle.  After UC1 parked his/her vehicle, the Dodge Ram then parked next to UC1's vehicle.  **IVAN** then exited the front driver's seat of the Dodge Ram and entered the front passenger seat of UC1's vehicle.

40.     While inside UC1's vehicle, **IVAN** handed UC1 a plastic bag

containing what appeared to be one kilogram of methamphetamine, and UC1 provided $5,200 to **IVAN** as payment. **IVAN** then counted the money and exited the vehicle.  Following the deal, the contents of the plastic bag that **IVAN** had provided to UC1 field tested positive for methamphetamine and weighed approximately 1,304.5 gross grams.  Law enforcement then followed **IVAN** back to the Indiana Residence, where it appears **JULIA** documented the deal in her ledgers.  Throughout this investigation, members of the DTO have referred to kilograms of methamphetamine as "aguas." According to the ledger, specifically a page marked "aguas," one "agua" (i.e., one kilogram of methamphetamine) was sold on August 11 for $5,200, which I believe refers to the controlled buy involving **IVAN** described above.



41.    Two days after this controlled buy, law enforcement obtained another wiretap.  On August 13, 2021, the Honorable Timothy D. DeGiusti, United States

Chief District Judge for the Western District of Oklahoma, signed an order pursuant to 18 U.S.C. § 2518, *et seq.* authorizing the continued interception of wire communications over (213) 984-3355 (TT1), used by **PEREZ-CAMACHO,** and the initial interception of wire and electronic communications over (405) 625-9026 (TT2), used by **JULIA**.  Interception began on August 13, 2021, and terminated on September 3, 2021.

42.   On August 17, 2021, at approximately 4:22 p.m., **PEREZ-CAMACHO**, using TT1, received a call from **JULIA**, who was using TT2 (TT1 Ref. # 2233) (TT2 Ref. #36).  The call pertained to two upcoming deliveries that **PEREZ-CAMACHO** would make in northern Mississippi, just south of Memphis, to **OMAR-MERAZ** and **LOYA-NAJERA**.

43.   **JULIA** begins the conversation by asking when he (**PEREZ-CAMACHO**) had gone to Columbus (Ohio). **PEREZ-CAMACHO** tells her it was on Monday.  **JULIA** then asks, "Did you take the last six (6)?"  **PEREZ-CAMACHO** responds by saying he (**PEREZ-CAMACHO**) will take them tomorrow.  **JULIA** then tries to clarify by asking, "You (**PEREZ-CAMACHO**) have them right?"  **PEREZ-CAMACHO** responds by saying "Yes."  **JULIA** then asks **PEREZ-CAMACHO** where he (**PEREZ-CAMACHO**) will be taking them tomorrow.  **PEREZ-CAMACHO** says Memphis.  **JULIA** responds by saying she does not have a date for those.  The call concludes with **PEREZ-CAMACHO** confirming that he will be leaving tomorrow.  Based on my training, experience,

36

and knowledge of the investigation, I believe that **JULIA** placed this call to **PEREZ-CAMACHO** to ask him if he had taken the remaining six kilograms of cocaine from her residence. When **PEREZ-CAMACHO** says yes, **JULIA** wants to know where he will be taking them, and **PEREZ-CAMACHO** tells her Memphis. I believe that **PEREZ-CAMACHO** had taken the remaining six kilograms of cocaine so that he could make deliveries to two different customers, **OMAR-MERAZ** and **LOYA-NAJERA**, the next day, August 18. And indeed, the following morning, August 18, 2021, at approximately 2:07 a.m., the tracker affixed to the Chrysler 200 showed **PEREZ-CAMACHO** leaving the Oklahoma City area and driving east until he arrived in the area of Memphis, Tennessee, at approximately 10:50 a.m.

44.     Shortly after arriving in the Memphis area, on August 18, 2021, at approximately 10:56 a.m., **PEREZ-CAMACHO**, using TT1, placed an outgoing call to (901) 848-0057, a number later identified as belonging to **OMAR-MERAZ** (TT1 Ref. # 2279). I believe **PEREZ-CAMACHO** made the call to alert **OMAR-MERAZ** that he had arrived. **OMAR-MERAZ** begins the conversation by telling **PEREZ-CAMACHO,** "Hey, it's going to be an Altima." **OMAR-MERAZ** then asks, "What are you in?" **PEREZ-CAMACHO** replies, "In the, in the same one as last time, sir. A small maroon one." **OMAR-MERAZ** then asks, "Maroon?" **PEREZ-CAMACHO** responds by saying, "Yes, a small maroon one." **OMAR-MERAZ** then asks **PEREZ-CAMACHO** if that is him. **PEREZ-CAMACHO**

37

confirms. At the time of this meeting, law enforcement had established surveillance at the La Siesta restaurant at 64 W. Commerce St., Hernando, Mississippi (located about 30 minutes south of Memphis), and observed **OMAR-MERAZ** approach the Chrysler 200 and speak with **PEREZ-CAMACHO**. Also at this location, law enforcement observed a tan Nissan bearing Mississippi license plate DAU-5727.[10]  Based on my training, experience, and knowledge of the investigation, I believe that in the above call, **PEREZ-CAMACHO** and **OMAR-MERAZ** coordinated their imminent cocaine deal, with **PEREZ-CAMACHO** telling **OMAR-MEREZ** that he would be in his maroon car (the Chrysler 200), just like the previous time, and **OMAR-MEREZ** stating he would be in the Altima.

45.    Law enforcement then observed **PEREZ-CAMACHO** and **OMAR-MERAZ** depart the La Siesta restaurant and drive to AutoZone Auto Parts, located at 2450 Mt. Pleasant Road, Hernando, Mississippi.  Next, law enforcement observed **PEREZ-CAMACHO** and **OMAR-MERAZ** leave the AutoZone parking lot in tandem.  Law enforcement then followed **PEREZ-CAMACHO** and **OMAR-MERAZ** to a residence at 3525 Bluff Road, Hernando, Mississippi.

46.    At approximately 11:30 a.m., law enforcement conducted a drive by

---

[10]    The vehicle registers to **OMAR-MERAZ** at 2525 Old Airways Roads, Southaven Mississippi. Photographs of **OMAR-MERAZ** from law enforcement databases confirm this was the same individual who met with **PEREZ-CAMACHO**.

of the residence at 3525 Bluff Road and observed a Hispanic male under **PEREZ-CAMACHO's** Chrysler 200.  As stated, law enforcement believes that **PEREZ-CAMACHO's** Chrysler 200 contains a hidden compartment that he uses to transport drugs and money, and it appeared that the Hispanic male was attempting to access it.  Due to the location of the house, law enforcement was not able to maintain surveillance on **PEREZ-CAMACHO** the entire time he was at the residence. Moments later, however, law enforcement observed **PEREZ-CAMACHO** depart the residence.  Based on my training, experience and knowledge with the investigation, I believe the Hispanic male was removing drugs from the hidden compartment of **PEREZ-CAMACHO's** Chrysler and that **PEREZ-CAMACHO** delivered three kilograms of cocaine to **OMAR-MERAZ**. As for why I believe that **PEREZ-CAMACHO** delivered three kilograms to **OMAR-MERAZ**, the intercepted call described above with **JULIA** (TT1 Ref. # 2233) (TT2 Ref. # 36) from the night before established that **PEREZ-CAMACHO** would be transporting six kilograms of cocaine to the Memphis area.  The next day, at approximately 11:06 p.m.—while **PEREZ-CAMACHO** was still with **OMAR-MERAZ—PEREZ-CAMACHO** received a call on TT1 from **LOYA-NAJERA**, who was using telephone number (901) 314-5817 (TT1 Ref. # 2280). During the call, **PEREZ-CAMAHO** tells **LOYA-NAJERA** that he had just arrived to see "the other guy," and that he would be seeing **LOYA-NAJERA** "more or less . . . like in an hour." A few moments later in the call, **LOYA-NAJERA**

39

clarifies that "it's three," which I believe referred to three kilograms of cocaine that he would be receiving from **PEREZ-CAMACHO**.

47. At approximately 1:02 p.m., still on August 18, 2021, **PEREZ-CAMACHO**, using TT1, placed an outgoing call to **LOYA-NAJERA** at his -5817 number (TT1 Ref. # 2287). **PEREZ-CAMACHO** and **LOYA-NAJERA** began the conversation by greeting one another. **PEREZ-CAMACHO** then says, "Listen, I'm here entering." **LOYA-NAJERA** responds by saying "Is it some trailers?" **PEREZ-CAMACHO** replies, "yes." **LOYA-NAJERA** continues, "Number fifteen." **LOYA-NAJERA** then goes on to say his (**LOYA-NAJERA**) car and truck are going to be there. **LOYA-NAJERA** says, "It's a white one and a red car." **PEREZ-CAMACHO** responds by saying that he is "coming down." **LOYA-NAJERA** responds, "Yeah. A white truck." **PEREZ-CAMACHO** and **LOYA-NAJERA** say alright and the call ends. Based on my training, experience, and knowledge of the investigation, I believe that in the above call **PEREZ-CAMACHO** and **LOYA-NAJERA** were coordinating for their imminent drug deal.

48. About three minutes later, at approximately 1:05 p.m., **PEREZ-CAMACHO**, using TT1, again placed an outgoing call to **LOYA-NAJERA** at his -5817 number to continue coordinating the meeting (TT1 Ref. # 2288). **LOYA-NAJERA** begins the conversation by stating, "Park, park, park, right there. Park right there." **PEREZ-CAMACHO** responds by saying "Uh. Alright, all set. I'm

entering here." **LOYA-NAJERA** replies, "Come, come here, come here inside." Both parties agree and the call ends.

49.     Law enforcement had maintained surveillance on **PEREZ-CAMACHO** after he left his earlier meeting with **OMAR-MERAZ** in Hernando, Mississippi.  **PEREZ-CAMACHO** then traveled to 256 Campground Dr., located in Coldwater, Mississippi.   At the campground, law enforcement observed **PEREZ-CAMACHO's** Chrysler 200**,** a white Dodge Ram 3500, a maroon Dodge Dart, and White Sportsmaster Camper with teal lettering.  The Tennessee license plate on the maroon Dodge Dart—QBLZQ5K—registers to **LOYA-NAJERA**. Law enforcement then observed **LOYA-NAJERA** open his trunk and obtain a pair of vehicle ramps at approximately 1:16 p.m.[11] **LOYA-NAJERA** then placed the ramps in front of **PEREZ-CAMACHO's** Chrysler 200 before the vehicle was pulled onto the ramps.  Law enforcement next observed the individuals remove parts of the front passenger-side tire area of the Chrysler 200.  Shortly after, law enforcement observed the individuals carry packages to the camper.  A short time later, **PEREZ-CAMACHO** and **LOYA-NAJERA** departed the campground. Based on my training, experience, and knowledge of the investigation, I believe that **LOYA-NAJERA** and **PEREZ-CAMACHO** pulled the Chrysler 200 onto the

---

[11]     Law enforcement was able to confirm that the individual who retrieved the ramps from the Dodge Dart was in fact **LOYA-NAJERA** by comparing this individual to **LOYA-NAJERA's** photograph from law enforcement databases.

ramps in order to access the hidden compartment containing the kilograms of cocaine, and that once the kilograms of cocaine were removed from the vehicle the above individuals carried the packages into the camper.

50.     **PEREZ-CAMACHO**, however, was not the only one delivering cocaine for the DTO.   On August 20, 2021, **JULIA** provided **LOPEZ** two kilograms of cocaine and received $64,000 from **LOPEZ** for two kilograms of cocaine and a kilogram of methamphetamine that he had previously purchased. That day, at approximately 12:26 p.m., law enforcement observed **LOPEZ** arrive at the Indiana Residence in his 2020 Chevrolet Silverado, exit his vehicle, and enter the Indiana Residence carrying a backpack.  Soon thereafter, at 12:47 p.m., law enforcement observed **LOPEZ** exit the residence with his backpack, enter his vehicle, and depart the residence.

51.     That **JULIA** had delivered two kilograms of cocaine to **LOPEZ** and received $64,000 for a previous payment was corroborated by a call she made soon after **LOPEZ** left the Indiana Residence.  At approximately 1:47 p.m., **JULIA** used TT2 to place a call to CHUY LNU at 52-639-167-8513 (TT2 Ref. # 84).  During the call, **JULIA** tells CHUY LNU, "Mono brought me sixty [for] two fine ones" and "four thousand for a water."  She also added, "And I gave him two fine ones." The Indiana Ledgers also confirm that on August 20 **LOPEZ** ("Mono") paid **JULIA** the $64,000 that he owed from a previous drug transaction.  Consistent with the call described above, the ledgers note that "Mono" (**LOPEZ**) paid "60K" ($60,000)

for "2 F" (two *finas*, or kilograms of cocaine) and "4K" ($4,000) for "1 A" (one *agua*,

or one kilogram of methamphetamine).  The ledgers also note that **JULIA** gave

**LOPEZ** an additional "2 F" (two kilograms of cocaine) on August 20.



52.   As discussed, **JULIA** was entrusted by the DTO to maintain its

reserves of bulk cash before that cash was transported out of Oklahoma and

smuggled to Mexico—often times with the help of **ROY**.  In fact, the Indiana

Ledgers suggest that drug proceeds were regularly deposited with **ROY**.  One

entry, for example, from April 22, 2021, shows that "105"—which I believe

corresponds to $105,000—was deposited with **ROY**.



A separate entry, this time from June 18, 2021, shows that the DTO deposited "202.076"—which I believe corresponds to $202,076—with **ROY**.



53.     And while the investigation established that **ROY** was distributing drugs for the DTO, his role as a money courier was on full display in the aftermath of a significant money seizure from the DTO that occurred on August 19, 2021. That day, law enforcement observed **JULIA** deliver a cardboard box to a money courier for the DTO at the 49th St. Residence.  Following the money courier's departure from the 49th St. Residence, law enforcement conducted a traffic stop on the courier's vehicle and deployed a state-certified canine to perform a free air sniff of the vehicle.   Once the canine alerted, law enforcement conducted a probable cause search of the vehicle and recovered the cardboard box delivered by **JULIA**, which contained $327,270.00.

54.     The next day, August 20, 2021, was when CHUY LNU, using his - 8513 number, placed the call described above to **JULIA** at TT2 (TT2 Ref. # 84), during which **JULIA** stated **LOPEZ** had just given her $64,000. In that call, **JULIA** asks, "so should I give that to Roy or should I leave it here?"  **CHUY LNU** then tells her, "Yes, yes, yes, he should bring at least that . . . at least send. . . sixty (60)."  **JULIA** then clarifies that she has "sixty-six" because "one thousand nine hundred" has already been "packaged."  CHUY LNU then tells her, "Send, send everything please."   The call concludes shortly after.  Based on my training, experience, and knowledge of the investigation, I believe that CHUY LNU was directing **JULIA** to deposit approximately $66,000 with **ROY**, which included the

45

$64,000 that **LOPEZ** had just brought **JULIA**, along with the $1,900 that she had already packaged.   This money handoff, of course, was of heightened importance at the time because the organization had just had $327,270 seized by law enforcement. Moreover, that **JULIA** planned to deposit the money with **ROY** was further corroborated in a call shortly after.   At approximately 2:00 p.m., **JULIA** used TT2 to place an outgoing call to **IVAN**, at (405) 625-9052 (TT2 Ref. # 86).  During the call, **JULIA** states, "I'm going to prepare what, what Mono gave me so Roy can take it."

55.    Next, just as CHUY LNU had directed **JULIA**, **JULIA** delivered the money to **ROY**.  Law enforcement observed **JULIA** drive her Chevrolet Cruze to 3701 S. May Ave., Oklahoma City.   In the parking lot of this location, law enforcement observed two other vehicles:  a dark colored Jeep Grand Cherokee, bearing Oklahoma license plate SRT-ROY—which is registered to **ROY** at 3044 SW 41st St., Oklahoma City—as well as a different Jeep Grand Cherokee bearing Oklahoma license plate KEV-820, which law enforcement has identified as belonging to **SOTO**.  At approximately 3:44 p.m., law enforcement observed **ROY** approach **JULIA's** Chevrolet Cruze and retrieve a bright green box.  **ROY** then proceeded to carry the box to his vehicle before entering the front passenger seat of **SOTO's** vehicle.   Based on my training, experience, and knowledge of the investigation, I believe that **JULIA** met with **ROY** to deliver the approximately $66,000 dollars, which was contained in the bright green box. I also believe that

46

**SOTO** was present at the deal.

56.     Eight days later, on August 28, 2021, **JULIA** delivered two kilograms of cocaine to a different Oklahoma-based customer—**SOTO**.  Coordination for the deal began that day, August 28, at approximately 2:39 p.m., when **JULIA** received an incoming call from CHUY LNU at approximately 2:39 p.m. (TT2 Ref. # 186). During the call, CHUY LNU asks **JULIA** how many "fine ones" she has left. **JULIA** responds that she has three left. CHUY LNU then tells **JULIA**, "Give two fine ones…to El Güero."  **JULIA** responds, **"**Okay. Two fine ones to El Güero." CHUY LNU confirms, and **JULIA** adds, "So we're going to have one left." **JULIA** then asks, **"**Okay. And when will they be getting here?  CHUY LNU responds, "by Wednesday, I think."   Based on my training, experience and knowledge of this investigation I believe that during this call, CHUY LNU was instructing **JULIA** to give two kilograms of cocaine to "El Güero" (**SOTO**).  **JULIA** notes that after she delivers those two kilograms of cocaine to El Güero (**SOTO**), the DTO will have one kilogram of cocaine remaining. CHUY LNU then advises her that an additional shipment of cocaine would be arriving on Wednesday.

57.     Immediately after this call, at approximately 2:44 p.m., **JULIA** used **TT2** to place an outgoing to **SOTO** at (405) 696-2063[12] (TT2 Ref. # 187).  The following is a verbatim transcript of the call.

---

[12]     This telephone number is registered to **SOTO** at 3706 S. Pennsylvania Ave., Oklahoma City—the address of **PEREZ-CAMACHO's** apartment.

| | |
|---|---|
| **SOTO**: | Hello? Hello? |
| **JULIA**: | What's the word, Güero? How are you? |
| **SOTO**: | All good, good, and you? |
| **JULIA**: | Well, fine thank God. Are you at home? |
| **SOTO**: | Yes, ma'am. |
| **JULIA**: | Okay. He told me to take you two (2). |
| **SOTO**: | Yes. |
| **JULIA**: | Okay. |
| **SOTO**: | Okay, all set. In about how much time will you be here? |
| **JULIA**: | Eh…well, just as long as it takes me. About ten (10), five (5) minutes. |
| **SOTO**: | Okay, all set. |
| **JULIA**: | Okay, then. Bye. |
| **SOTO**: | Make it the good kind okay? |
| **JULIA**: | All set. |
| **SOTO**: | Alright, then. |
| **JULIA**: | Bye. |

Based on my training and experience and knowledge of this investigation, I believe **JULIA** made this call to **SOTO** to coordinate the delivery of the two kilograms of cocaine to **SOTO**, as instructed by CHUY LNU.   Next, at approximately 2:56 p.m., the pole cam positioned at the Indiana Residence

48

captured **JULIA** leaving the residence in her other vehicle, a white GMC bearing Oklahoma license plate KEV071.[13]  Based on my training, experience, and knowledge of the investigation, I believe that **JULIA** made this trip to deliver the two kilograms of cocaine to **SOTO**.

58.     **SOTO** would pay for the two kilograms of cocaine the next day, August 29, 2021.  That day, at approximately 9:40 p.m., **JULIA** received an incoming call on **TT2** from **SOTO** (TT2 Ref. # 217), during which **SOTO** told **JULIA** know he was on his way to her house.  At approximately 9:47 p.m., law enforcement observed **SOTO's** vehicle, a black Jeep Latitude, arrive at 9601 S. Indiana Avenue, where it remained for a short time.  Based on my training, experience, and knowledge of this investigation, I believe **SOTO** traveled to the Indiana Residence to pay $51,000 for the two kilograms of cocaine that **JULIA** had delivered to him the day prior.  In fact, the Indiana Ledgers confirm this.  The ledgers detail how **JULIA** was initially in possession of nine kilograms of cocaine. Six of those appear to have been taken by **PEREZ-CAMACHO** on August 26, leaving the organization with three kilograms of cocaine—just as **JULIA** had told CHUY LNU during their August 28 call (TT2 Ref. # 186).  The ledgers next note that two of those three kilograms were given to **SOTO** ("El Güero") on August 28.

---

[13]     This vehicle is registered to **JULIA** at the Indiana Residence.



And finally, the Indiana Ledgers confirm that the next day, August 29, 2021,

**SOTO** (El Güero) paid **JULIA** $51,000.



59.    Three days later, on September 1, 2021, **JULIA** would deliver a

kilogram of methamphetamine to **DOMINGUEZ**.   Coordination for the deal

began that day, at approximately 1:23 p.m., when **JULIA** received an incoming call on TT2 from **IVAN** (TT2 Ref. # 249).  During the call, **IVAN** asks **JULIA** if she will take "one" to "Golo" (**DOMINGUEZ**), and **JULIA** agrees. At the time, law enforcement had established surveillance on **JULIA** while she was at a Ross Dress for Less located at 1433 W Interstate 240 Service Rd, Oklahoma City, Oklahoma. Next, at approximately 1:32 p.m., law enforcement observed **JULIA** depart the Ross Dress for Less in her Chevrolet Cruze.  **JULIA** drove directly to the 49th St. Residence, where she arrived at approximately 1:43 p.m.  This location was significant, as law enforcement had previously identified as a stash house for the DTO.[14]

60.    At approximately 1:46 p.m., **JULIA** placed an outgoing call to **IVAN** at (405) 625-9052 (TT2 Ref. # 250).  During this call **JULIA** tells **IVAN**, "It's fourteen six-hundred of what's there."  As the call continues, **JULIA** asks **IVAN**, "What kind do I deliver? From the tupper?" **IVAN** replies, "Uh, the other ones. Either one." Based on my training, experience, and knowledge of the investigation, I believe that in this call, **JULIA** tells **IVAN** there was approximately 14,600

---

[14]    For example, on August 19, 2021, at approximately 5:40 p.m.—hours after the seizure of $327,270 on August 19, 2021, from the DTO's money courier—**JULIA** received a phone call on TT2 from CHUY LNU, using 52-639-167-8513, during which the two discussed the "groceries" that were still at the house "on 49th" where **JULIA** stated she had delivered the money (TT2 Ref. # 74).  **JULIA** informed CHUY LNU that there were "sixteen" "waters", as well as "a little chorizo" left at the 49th St. Residence.

grams of methamphetamine at the 49th St. Residence and she was asking **IVAN** which kind of methamphetamine she should deliver to **DOMINGUEZ**.

61.     Roughly five minutes later, at approximately 1:51 p.m., law enforcement observed **JULIA** exit the residence at 1108 SW 49th Street. Shortly after that **JULIA** placed an outgoing call to **DOMINGUEZ** at (405) 968-0100 (TT2 Ref. # 251), during which **JULIA** told **DOMINGUEZ** she would be there in approximately 1 minute.  At approximately 1:56 p.m. law enforcement observed **JULIA** arrive at the Hillcrest apartments at 1402 SW 49th Street, Oklahoma City, Oklahoma, which investigators have identified as **DOMINGUEZ's** residence.  Based on my training, experience, and knowledge of the investigation, I believe that **JULIA** made this trip at the behest of **IVAN** to deliver one approximately one kilogram of methamphetamine to **DOMINGUEZ**.  In fact, the Indiana Ledgers confirm this, as they document that one kilogram was delivered to **DOMINGUEZ** ("Golo") on September 1, 2021, in addition to several other instances.



62.     Another round of Title III wiretaps followed.  On September 27, 2021, the Honorable David L. Russell, United States Chief District Judge for the Western District of Oklahoma, signed an order pursuant to 18 U.S.C. § 2518, *et seq.* authorizing the interception of wire communications over (405) 625-9052 (TT3), used by **IVAN**, and (405) 763-9184, used by **JULIA**, and the initial interception of wire and electronic communications over (214) 909-5101, used by **PEREZ-CAMACHO**.  Interception began on September 27, 2021, and terminated on October 26, 2021.[15]

63.     By the time law enforcement received authorization for the above wiretaps, both wire intercepts and the tracker on **PEREZ-CAMACHO's** Chrysler

---

[15]     On September 28, 2021, **PEREZ-CAMACHO** called T-Mobile to change his phone number, which was then changed from the -5101 number to (239) 710-8142.  Because the IMSI number did not change, the Court's September 27 Order authorized law enforcement to intercept wire and electronic communications over **PEREZ-CAMACHO's** new -8142 number (**TT4**).

200 established that he had moved to Indianapolis at the behest of CHUY LNU to work for the DTO there.[16]   With **PEREZ-CAMACHO** having moved to Indianapolis, it appeared that **DOMINGUEZ** would be taking a larger role within the DTO.  A call on October 1, 2021, between **DOMINGUEZ**, using (405) 968-0100, and **PEREZ-CAMACHO** (TT4 Ref. # 215) established that **DOMINGUEZ** would be taking over **PEREZ-CAMACHO's** job of delivering drugs across the country.   During the call, **DOMINGUEZ** tells **PEREZ-CAMACHO**, "Fasti already sent me the money yesterday and I am going to go for the car, but what, what car should I get, fool?"  **DOMINGUEZ** continues, clarifying, "For the trap, just for the trap, fool.  He's going to sell me the car, fool.  Just the trap, fool." **PEREZ-CAMACHO** tells **DOMINGUEZ**, "Uh-huh. Yes, yes. It's because right now he's telling me that . . . hold on.  He was telling me that one like… a Cruze like my Aunt Julie's."  **PEREZ-CAMACHO** then asks **DOMINGUEZ** what cars are available.   **DOMINGUEZ** tells him, "There's a Malibu there, fool, two-thousand eighteen. There's a…a, what are they called? The Cruze, fool, there's two Cruze, fool. Uh, what else? There's a, well, the BMW that I showed you." **DOMINGUEZ** also states there's a Cadillac and a Mercedes."   **PEREZ-CAMACHO** asks, "does the Malibu have the dashboard like my aunt's . . . like

---

[16]   A call on October 1, 2021, essentially confirmed that **PEREZ-CAMACHO** had moved (TT1 Ref. # 201).   During the call, **PEREZ-CAMACHO** states, "I'm living here in Indianapolis."

54

the, like the Cruze?"  The two continue discussing different types of vehicles, with **DOMINGUEZ** explaining that he is going to "Raleigh, North Carolina."  Later in the conversation, **PEREZ-CAMACHO** notes that the Malibu "has good accessories on the dashboard" and "other than driving smooth, they're . . . not flashy, you know what I mean?"  **PEREZ-CAMACHO** continues to explain the benefits of the Malibu, noting that "for the accessories it's really easy." **DOMINGUEZ** asks, "Putting them in and everything?"  **PEREZ-CAMACHO** confirms, "Yes, yes, you don't have to get off the car or anything, fool." **DOMINGUEZ** then asks, "Everything up there through the, the… thing, right?" **PEREZ-CAMACHO** replies, "Yes, everything up, everything up, yeah."  He also notes that "even at a Supercenter, even at a store they can do it."  **PEREZ-CAMACHO** continues, telling **DOMINGUEZ** to "get the windows tinted . . . so they can't look too much inside and they can do the job at a store more quickly." Before the call concludes, **PEREZ-CAMACHO** tells **DOMINGUEZ** he will contact a friend about obtaining the vehicle for **DOMINGUEZ**.

64.    Based on my training, experience, and knowledge of the investigation, I believe that during this call, **DOMINGUEZ** and **PEREZ-CAMACHO** are discussing **DOMINGUEZ** possibly assuming **PEREZ-CAMACHO's** prior role of delivering drugs to out-of-state customers.  **PEREZ-CAMACHO** gives **DOMINGUEZ** advice primarily about the best vehicles for transporting drugs, explaining that some vehicles allow for compartments to be

55

installed that can then be accessed from the inside.  **PEREZ-CAMACHO**—who during this investigation has driven two different Chevrolet Cruzes, a Chevrolet Malibu, and a Chrysler 200—recommends a Chevrolet Cruze like the one **JULIA** drives because they drive well and are not flashy—and would thus not attract law enforcement.  I also believe that **PEREZ-CAMACHO** favors vehicles where the trap compartment can be quickly accessed from inside because it allows the occupant to conduct drug deals without leaving the vehicle.  Law enforcement believes the call demonstrates **PEREZ-CAMACHO's** expansive knowledge gained from acting as a courier for this DTO and suggests that **DOMINGUEZ** would soon be taking over **PEREZ-CAMACHO's** courier duties—and like **PEREZ-CAMACHO**—would be transporting drugs in a hidden compartment.

65.    With **PEREZ-CAMACHO** in Indianapolis, he still needed a way to service local customers such as L.N.[17]  To that end, he used his brother **KEVIN**

---

[17]    By October 2021, the investigation had established that **PEREZ-CAMACHO** was selling cocaine to a customer, L.N., located in Spencer, Oklahoma.  For example, **PEREZ-CAMACHO** was intercepted on calls on July 23 and July 24, 2021 setting up a deal that ultimately occurred in the Spencer area.  During the July 23 call (TT1 Ref. # 449), **PEREZ-CAMACHO** asked an unidentified male, using telephone number (405) 830-6244 (UM6244) for a "car" for tomorrow. (As discussed *supra*, intercepts have established that members of the DTO sometimes use "car" when referring to a kilogram of cocaine.)  UM6244 told **PEREZ-CAMACHO** that he was in Mexico but that he has a buddy who could deliver it in thirty minutes to **PEREZ-CAMACHO's** apartment.  Shortly after, surveillance captured an unknown male in a tan Hyundai arrive to **PEREZ-CAMACHO's** apartment.  That the individual in the tan Hyundai had delivered a kilogram of cocaine—a "car"—to **PEREZ-CAMACHO** was seemingly confirmed the next day, on July 24.  That day, at

and **DOMINGUEZ** to deliver a kilogram of cocaine to L.N. on October 8, 2021. Coordination for the deal began the day prior, October 7, at approximately 1:03 p.m., when **PEREZ-CAMACHO**, using TT4, sent a text message to (405) 541-5382, a phone number law enforcement knows to be used by L.N. (TT4 Ref. # 541). The text message, which was sent in English, read, "Sr you think i can take you the pair of shoes for 2morrow sorry to bother you sr im just asking cuz im omw (on my way) to OKLAHOMA rn im (right now) trynna get back saturday eveSr you think i can take you the pair of shoes for 2morrow sorry to bother you sr im just asking cuz im omw to OKLAHOMA rn im trynna get back saturday evening, let me know i'll stay if you cant 2 morrowning, let me know i'll stay if you cant 2 morrow"   L.N. responded, "U can come today if you want" (TT4 Ref. # 543). **PEREZ-CAMACHO** then replied, "Ok if I make cuz im like 9 hrs if not rmw in

---

approximately 10:03 a.m., **PEREZ-CAMACHO** placed an outgoing call (**TT1** Ref. # 482) to (405) 541-5382, a phone later confirmed to belong to L.N.  During the call, L.N. told **PEREZ-CAMACHO** that he would be sending him the address.   Law enforcement did not intercept L.N. sending the address, however, but the WhatsApp pen register on **PEREZ-CAMACHO's** phone showed him receiving a message from L.N.  It appears that L.N. did, in fact, send the address via WhatsApp to **PEREZ-CAMACHO** because the GPS tracker on **PEREZ-CAMACHO's** Chrysler 200 showed him traveling to east Oklahoma City, where he pulled off on the side of the road near 4217 Diana Ave., Spencer, Oklahoma—an address which, as described below, was later confirmed as belonging to L.N.  **PEREZ-CAMACHO** then traveled directly back to his apartment at 3706 S. Pennsylvania Ave., where law enforcement observed him retrieve a shoebox out of his vehicle's trunk—which I believe contained the drug proceeds from the deal—and carry it into his apartment.

the morning sr for sure" (TT4 Ref. # 546).  Based on my training, experience, and knowledge of the investigation, I believe that in the above call **PEREZ-CAMACHO** and L.N. were coordinating for **PEREZ-CAMACHO** to deliver, or have delivered on his behalf, a kilogram of cocaine.

66.     As explained, however, **PEREZ-CAMACHO** was not in Oklahoma at the time, so at 1:22 p.m., he then called his brother **KEVIN** at (405) 968-6158 about conducting the deal.  During the call (TT4 Ref. # 556), **KEVIN** tells **PEREZ-CAMACHO** that he is currently with "El Güero" (**SOTO**), "El Licenciado" (**LOPEZ-CARREON**), and "Golo" (**DOMINGUEZ**)."  **PEREZ-CAMACHO** then asks **KEVIN** to ask someone for a ride to go see a "black guy" and drop off a "device."  **KEVIN** agrees and tells **PEREZ-CAMACHO** he will ask "Gordo" once he gets out of the shower.   Based on my training, experience, and knowledge of the investigation, I believe that in the above call, **KEVIN**, on behalf of **PEREZ-CAMACHO**, was agreeing to drop off a kilogram of cocaine (a "device").

67.     Right after this call, at 1:25 p.m., **PEREZ-CAMACHO** texted L.N., "My brother is gonna take you that today sr" (TT4 Ref. # 557), and then, "Its ok?" (TT4 Ref. # 559).  L.N. responded, "I can wait on you tomorrow morning."  (TT4 Ref. # 567).  **PEREZ-CAMACHO** then replied, "Ok sr thank you ill se you tmw" (TT4 Ref. # 568).  **PEREZ-CAMACHO** then once again called **KEVIN** at (405) 968-6158 (TT4 Ref. # 572).  During the call,  **PEREZ-CAMACHO** tells **KEVIN**, "Nevermind after all" because **PEREZ-CAMACHO** was on his way to Oklahoma

and would be delivering it himself the following day.

68.    As described below, however, **PEREZ-CAMACHO** ultimately did not come back to Oklahoma and deliver the cocaine himself and instead used his brother **KEVIN** and **DOMINGUEZ** to conduct the deal.  Later that day, on October 7, at approximately 3:19 p.m., **DOMINGUEZ**, using (405) 968-0100, called **PEREZ-CAMACHO** (TT4 Ref. # 590), during which the two discussed the deal.  During this call, **PEREZ-CAMACHO** asked **DOMINGUEZ**, "Do you think you could do me a favor tomorrow, dude?" **DOMINGUEZ** responds, "For sure. What's up?"  **PEREZ-CAMACHO** replies, "To take a device there to a buddy where we went to once?" **DOMINGUEZ** then agrees, "For sure. Fuck it." **PEREZ-CAMACHO** then tells **DOMINGUEZ**, "There with Kevin.  With Kevin, dude. It's because Kevin is going to drop it off. You just take him and I'll give you some money. I'll give you two-hundred dollars."  Based on my training, experience, and knowledge of the investigation, I believe that in this call, **PEREZ-CAMACHO** was coordinating with **DOMINGUEZ** to have him take **KEVIN** to deliver one kilogram of cocaine ("a device") to L.N., and that **PEREZ-CAMACHO** and **DOMINGUEZ** had delivered to L.N. previously ("where we went once").

69.    Then, at approximately 3:20 p.m., **PEREZ-CAMACHO**, using TT4, placed an outgoing call to his brother **KEVIN** (TT4 Ref. # 592), ostensibly to give him instructions for the delivery to L.N.  During the call, **PEREZ-CAMACHO** tells, **KEVIN** that "Golo (**DOMINGUEZ**) is going to take you." **PEREZ-**

**CAMACHO** then gives **KEVIN** instructions on what to do: "Just wear a low cap, dude.  Low, not so low, okay . . . because the black dude knows Ivan, dude." **PEREZ-CAMACHO** also says "to take it to him" and to put "them under . . . the belt and everything, don't have, don't have anything in your hands."  Finally, **PEREZ-CAMACHO** tells **KEVIN** to "just knock" and "just tell him that you're going on behalf of your brother."  Based on my training, experience, and knowledge of the investigation, I believe that **PEREZ-CAMACHO** was giving **KEVIN** detailed instructions on how to deliver the kilogram of cocaine to **LINCOLN**: while wearing a low hat and without holding anything in his hands, which I believe based on my training and experience was to avoid detection by law enforcement.

70.     In anticipation of the deal, law enforcement established surveillance the next morning at **PEREZ-CAMACHO's** apartment located at 3706 S. Pennsylvania Ave., Oklahoma City.    At approximately 10:42 a.m., **DOMINGUEZ's** black Chevrolet Cruze, bearing a paper tag, arrived at the apartment.  **KEVIN** then exited the passenger seat of the vehicle and entered **PEREZ-CAMACHO's** apartment, number 213.   **KEVIN** remained in the apartment for a few minutes, before returning to the passenger seat of the vehicle. The vehicle then departed at 10:45 a.m.  Law enforcement was able to take photographs of **KEVIN** retrieving the one kilogram of cocaine from **PEREZ-CAMACHO's** apartment.



71.     That **KEVIN** had in fact retrieved the one kilogram of cocaine from the apartment was confirmed by the call he made to **PEREZ-CAMACHO** at TT4 at approximately 10:45 a.m. (TT4 Ref. # 620).  During the call, **KEVIN** states, "I just picked up the device, fool. Here from the apartment." **PEREZ-CAMACHO** then proceeded to give directions to L.N.'s residence. Moreover, that **DOMINGUEZ** was driving was further confirmed during the call when **PEREZ-CAMACHO** stated, "let me talk to Golo," and **KEVIN** passed the telephone to **DOMINGUEZ** to give him additional directions.

72.     Law enforcement then established surveillance at L.N.'s residence at 4217 Diana Ave., Spencer, Oklahoma.  At approximately 11:14 a.m., law enforcement observed **DOMINGUEZ's** black Chevrolet Cruze arrive at the residence.  **KEVIN** then exited the vehicle and entered the residence, before returning to and reentering the Cruze.  Law enforcement then observed the Cruze depart at approximately 11:16 a.m.  Then, at approximately 11:16 a.m., **PEREZ-CAMACHO** used TT4 to call **KEVIN** at his -6158 number (TT4 Ref. # 627).

During the call, **KEVIN** tells **PEREZ-CAMACHO**, "Listen, I already delivered it. He already turned in the receipt and everything. Now we're heading to the house."

73.    A few days later, on October 13, 2021, law enforcement executed a search warrant on L.N.'s residence at 4217 Diana Ave. and located two kilogram-sized bricks of white powder that field tested positive for cocaine and weighed approximately 2,482 grams.   Law enforcement also found evidence of a crack cocaine conversion lab in the kitchen and two firearms in the living room.   L.N. was arrested subsequently arrested and in a Mirandized interview confirmed that the recovered cocaine belonged to him, that he had been distributing the cocaine, and that he had been paying between $33,000 and $34,000 per kilogram.   Based on my training, experience, and knowledge of the investigation, I believe that on October 8, 2021, **DOMINGUEZ** and **KEVIN** delivered one kilogram of cocaine to L.N.—a regular customer of the DTO—at the behest of **PEREZ-CAMACHO**.

74.    Meanwhile, **IVAN's** drug distribution activities continued.   On October 12, 2021, at approximately 11:45 a.m., **IVAN**, using **TT3**, placed an outgoing call to GUSTAVO-MARTINEZ at telephone number (918) 859-4879 (**TT3** Ref. # 228).  After greeting, GUSTAVO-MARTINEZ tells **IVAN**, "I forgot to call you." **IVAN** responds, "Oh, yeah. Hey, is it, it going to happen or what…what?" GUSTAVO-MARTINEZ replies, "Yes. Come over, dude."  **IVAN** then affirms, and GUSTAVO-MARTINEZ then tells **IVAN**, "I will wait for you here . . . at the

restaurant." At approximately 12:44 p.m., the court-authorized GPS tracker on **IVAN's** Dodge Ram truck showed the vehicle departing the Indiana Residence and traveling towards Tulsa, Oklahoma.[18]

75.    Law enforcement then established surveillance in the vicinity of Tia Chepa's restaurant, located at 10915 E. 31st St., Tulsa, Oklahoma.    At approximately 2:30 p.m., law enforcement observed **IVAN's** Dodge Ram truck arrive to the restaurant. Simultaneously, **IVAN**, using **TT3**, placed an outgoing call to GUSTAVO-MARTINEZ to tell him that he was outside (TT3 Ref. # 229). GUSTAVO-MARTINEZ says, "Give me a moment."

76.    At approximately 2:38 p.m., law enforcement observed GUSTAVO-MARTINEZ walk to the passenger side of **IVAN**'s vehicle and obtain a yellow sack from **IVAN**.  Shortly after, law enforcement observed **IVAN** depart the parking lot and GUSTAVO-MARTINEZ walk back into the restaurant without the yellow sack.  Because law enforcement never observed GUSTAVO-MARTINEZ walk into the restaurant with the yellow sack that he had obtained from **IVAN**, investigators believe that GUSTAVO-MARTINEZ placed the yellow sack inside his (GUSTAVO-MARTINEZ) 2009 Honda Odyssey bearing Oklahoma license plate LGZ-344. Surveillance was then maintained on the Honda Odyssey.

---

[18]    On August 18, 2021, the Hon. Suzanne Mitchell, U.S. Magistrate Judge for the Western District of Oklahoma, granted an order authorizing the installation and monitoring of a GPS device on this vehicle.

77.     At approximately 3:53 p.m., law enforcement observed GUSTAVO-MARTINEZ enter the driver's seat of the Honda Odyssey and depart the parking lot.  Law enforcement then maintained surveillance on GUSTAVO-MARTINEZ for a short while before conducting a traffic stop on his vehicle for unsafe lane movement.  Law enforcement then ran a state-certified K-9 around GUSTAVO-MARTINEZ's vehicle for a free air sniff, and the K-9 alerted for the presence of narcotics in GUSTAVO-MARTINEZ's vehicle.  After a probable cause search of the vehicle, officers located approximately one kilogram of cocaine inside the yellow sack and placed GUSTAVO-MARTINEZ under arrest.  Based on my training, experience, and knowledge of the investigation, I believe that **IVAN** delivered this one kilogram of cocaine to GUSTAVO-MARTINEZ.

78.     Throughout this investigation, law enforcement was able to identify several trips that **JULIA** and/or **AARON** made to Tulsa, Oklahoma, on behalf of the DTO.  One such trip occurred on October 15, 2021, when **JULIA** and **AARON** traveled to Tulsa to meet with **ALVAREZ**, who delivered $21,000 and a returned a kilogram of cocaine to **JULIA** and **AARON**.  Coordination for the meeting began the day prior, on October 14, at approximately 4:47 p.m., when **JULIA** used **TT5** to place an outgoing call to **ALVAREZ** at (918) 982-8167 (TT5 Ref. # 166).  During the call, **JULIA** tells **ALVAREZ**, "Hey, this man asked me to call you." **ALVAREZ** responds, "Yes, I have some papers."  The two then made plans to meet the next morning, with **JULIA** telling **ALVAREZ** that she (**JULIA**) would

64

"try to be there exactly at eight" the next morning. Based on my training, experience, and knowledge of the investigation, I believe that **JULIA** had called **ALVAREZ** because **ALVAREZ** was in possession of drug proceeds ("papers") and that the two coordinated a meeting for 8:00 a.m., the next morning, October 15.

79. The following day, on October 15, 2021, at approximately 6:20 a.m., the GPS tracker attached to **JULIA's** Chevrolet Cruze showed her vehicle leaving the Indiana Residence and begin traveling east towards Tulsa, Oklahoma. At approximately 7:59 a.m., the GPS tracker on the Chevrolet Cruze showed the car arriving at 5215 S. Wheeling Ave., Tulsa, Oklahoma. Law enforcement observed two other vehicles at the residence, both of which are registered to **ALVAREZ** at 5215 S. Wheeling Ave., Tulsa, Oklahoma: (1) a white Chevrolet Silverado bearing Oklahoma license plate HMQ994; and (2) a blue Nissan Titan bearing Oklahoma license plate KHG117.

80. As she was arriving, **JULIA** used TT5 to place an outgoing call to **ALVAREZ**, who was again using her -8167 number, to alert **ALVAREZ** that she (**JULIA**) had arrived (TT5 Ref. # 176). At approximately 8:01 a.m., law enforcement observed **JULIA** enter the residence on Wheeling Ave. **JULIA** was inside the residence for approximately two minutes before returning to her Chevrolet Cruze and leaving the location. Law enforcement then maintained surveillance on the Cruze as it traveled to a QuikTrip gas station located at 5111 S. Lewis Ave., Tulsa, Oklahoma. **JULIA** and **AARON** were then

observed exiting the Chevrolet Cruze and entering the QuikTrip for a short time before returning to their vehicle and leaving the location.

81.   Based on my training, experience, and knowledge of the investigation, I believe that **ALVAREZ** is a Tulsa-based distributor for the DTO, and that **JULIA** and **AARON** traveled to Tulsa on October 15, 2021, to pick up drug proceeds—specifically $21,000—from her, as well as retrieve an extra kilogram of cocaine that **ALVAREZ** had in her possession.  The ledgers specifically note that on October 15, 2021, "Andrea" (**ALVAREZ**) delivered "21.000," which I believe corresponds to $21,000.  According to the ledgers, **ALVAREZ** also *devolvió* (Spanish for "returned") "1 F" (one *fina*, or one kilogram of cocaine).



82.   Moreover, a separate page of the Indiana Ledgers further corroborated that **ALVAREZ** had returned one kilogram of cocaine.  Based on my training, experience, and knowledge of this investigation, I believe that the page from the ledger depicted below shows that on October 15, 2021, Andrea, who was based in Tulsa ("T"), returned (*devolvió*) "1 F" (one *fina*, or one kilogram of

cocaine").  The ledgers also notes that the one kilogram of cocaine would have been

*traída* (Spanish for "brought"), which resulted in the DTO having a cocaine supply

of 13 kilograms at that time.[19]



83.    A few days later, on October 19, 2021, **IVAN** and CHUY LNU began

---

[19]    I do not believe that **ALVAREZ's** October 15 delivery of a kilogram of
cocaine and $21,000 to **JULIA** and **AARON** was the only time she dealt with
**JULIA** on behalf of the DTO.  For example, one page of the ledgers kept a
running tally of *finas* or kilograms of cocaine the DTO had on hand.  The
Indiana Ledgers note that on "10-Sept" (September 10, 2021), "Andrea"
(**ALVAREZ**) received two of the DTO's 16 kilograms of cocaine.  A separate
page of the ledger appears to contain debts owed by couriers and distributors
of the DTO, including "Roy" (**ROY**), "Güero" (**SOTO**), "Alexis" (**PEREZ-
CAMACHO**), and "Mono" (**LOPEZ**).  That page notes that on September 10,
2021, **ALVAREZ** had a debt of "60.000" ($60,000)—consistent with the price
of two kilograms of cocaine she would have received that day from the DTO.  It
also notes that the debt was later reduced by $9,000, which was consistent with
a separate page of the ledger showing that on September 23, 2021, **ALVAREZ**
deposited $9,000 with **JULIA**.

coordinating for **IVAN** to deliver five kilograms of cocaine to **LINCOLN** and a half-kilogram to a Tulsa-based customer. On October 19, 2021, **IVAN** received an incoming call from CHUY LNU at approximately 1:44 p.m. (TT3 Ref. # 289). In this call, CHUY LNU asks **IVAN** if he has ever been to Little Rock before. **IVAN** and CHUY LNU then confirm with each other that it is a black guy in Little Rock. CHUY LNU then explains, "Right now there is a vehicle on the way there . . . there is a vehicle on the way, it is a little truck." **IVAN** affirms, and CHUY LNU states, "It is carrying five (5) inside," and that the delivery "would be to take him ("the black guy") those five tomorrow." CHUY LNU goes onto explain that "Avion" needed **IVAN** to go see the guy "from the restaurant" tomorrow and that he would need "half" of the "fine ones." Before the call concludes, CHUY LNU again remains **IVAN** that "those five are for the black guy." Based on my training, experience, and knowledge of this investigation, I believe that in this call, **CHUY LNU** was instructing **IVAN** to deliver five kilograms of cocaine to **LINCOLN** in Arkansas (the "black guy") and to deliver another half-kilogram to a Tulsa-based customer the next day, October 20. CHUY LNU also explains to IVAN that the five kilograms of cocaine for **LINCOLN** would be arriving in a small truck.

84. Not thirty minutes later, at approximately 2:08 p.m., **IVAN** received an incoming call on TT3 from **LINCOLN**, using (830) 443-1954 (TT3 Ref. # 300).[20]

---

[20] Based on voice analysis of the July 20 call between **PEREZ-CAMACHO** and **LINCOLN** (TT1 Ref. # 248), in which the two coordinated for **PEREZ-**

During the call, **IVAN** spoke in broken English, explaining, "me no speak English, only, uh . . . for the text." In any event, the two were able to make plans for **IVAN** to come at 8:00 a.m. the next morning (October 20). **LINCOLN** then tells **IVAN** he will send the address. Based on my training, experience, and knowledge of the investigation, I believe that **IVAN** was coordinating with **LINCOLN** to deliver him five kilograms of cocaine the next day.

85. Later that day, at approximately 3:16 p.m., **IVAN** received an incoming call from UM0460 at (918) 568-0460 (TT3 Ref. # 310). During this call, **IVAN** tells the unknown male (UM0460) he will see him tomorrow around 2:00 or 3:00 p.m., **IVAN** asks, if this is the restaurant guy, and UM0460 responds that he is the restaurant guy's cousin. UM0460 goes on to state that he has seen **IVAN** a couple of times on "thirty-first" before. UM0460 agrees to send **IVAN** and address to meet and the call ends. Based on my training, experience, and knowledge of this investigation, I believe that in this call, **IVAN** is coordinating with UM0460 about the delivery of the half-kilogram of cocaine that he will make to him in Tulsa.

86. Next, at approximately 5:40 p.m., **IVAN** received an incoming call on TT3 from CHUY LNU, who was using telephone number 52-639-165-6239 (TT3

---

**CAMACHO** to deliver six kilograms of cocaine to **LINCOLN** that day, law enforcement believes that **LINCOLN** had switched his number to the -1954 number and was now using this new number to coordinate with **IVAN**.

Ref. # 319).  During the call, CHUY LNU tells **IVAN** that the person would be arriving in like 20 minutes and that "it's a matter of picking up, picking up the vehicle . . . taking it to the shop, so you can work on it and that's it."  CHUY LNU continues, "It is a matter of taking the dashboard off but once you are at the shop . . my friend will call you because to explain how it is because I do not know exactly how it is."  **IVAN** then tells CHUY LNU, "All good, all good. Uh . . . either way I will wait for this person."  Based on my training, experience, and knowledge of the investigation, I believe that in this call CHUY LNU was explaining to **IVAN** that the truck arriving with five kilograms of cocaine would arrive in twenty minutes and that **IVAN** would have to take the dashboard apart in order to retrieve the five kilograms of cocaine.

87.    At approximately 6:12 p.m., law enforcement observed **IVAN's** Dodge Ram truck arrive at the Hampton Inn and Suites located at 920 SW 77th St. in Oklahoma City and park on the east side of the lot directly next to a black Dodge Dakota truck bearing Oklahoma license plate LEH971.  A short time later law enforcement observed a female walking away from the Dodge Dakota and into the hotel.  **IVAN** then entered the driver's seat of the Dodge Dakota and departed the hotel.  Law enforcement maintained surveillance on the Dodge Dakota as **IVAN** drove it to the Indiana Residence, pulled into the garage, and closed the garage door behind him.

88.    I believe that **MORALES** was the person who delivered the five

kilograms of cocaine to **IVAN**: the license plate on the Dodge Dakota truck registers to "Nancy Isabel Morales Rodriguez" (**MORALES**) at 1417 N Lewis Ave., Tulsa, Oklahoma. Further, records of border crossings show that earlier that morning, on October 19, 2021, the Dakota had crossed into the United States from Mexico in El Paso at approximately 9:06 a.m., and that the driver and sole occupant of the Dodge Dakota was **MORALES**.

89.    At approximately 8:31 p.m., **IVAN** placed a phone call using TT3 to CHUY LNU at his -6239 number (TT3 Ref. # 322).  During this conversation, **IVAN** tells CHUY LNU that they were already done with it and asked if he had to return it or when.  CHUY LNU told **IVAN** to return it tomorrow if he could not return it today (October 19, 2021).  **IVAN** then states, "it does have a lot of screws and I think it is going to take some time to put it back together again." CHUY LNU then tells **IVAN** to return the car tomorrow.  **IVAN** responds and tells CHUY LNU that he is going to Arkansas and then to the "T" so he would be busy all day doing that.  **IVAN** then asked if he could wait another day.  CHUY LNU answers that he would let them know to wait a little more.  Both parties conclude the phone call shortly after.  Based on my training, experience, and knowledge of this investigation I believe that **IVAN** made this call to CHUY LNU to inform him that he had removed the five kilograms of cocaine—destined for **LINCOLN**—from the dashboard compartment of the Dodge Dakota.  During the call, **IVAN** also inquires about returning the vehicle and lets CHUY LNU know that the dash

needed to be put back together.

90.     The following day, October 20, 2021, at approximately 8:48 a.m., the tracker on **IVAN's** Dodge Ram arrived in the area of Fort Smith, Arkansas.   At 9:24 a.m. there was a malfunction in the tracker not allowing law enforcement to continue to track the movements of **IVAN**. Nonetheless, it appears that **IVAN** delivered five kilograms of cocaine to **LINCOLN** early that morning of October 20, as pen register information shows that **LINCOLN**, using his -1954 number, sent **IVAN** a text message at approximately 8:15 a.m.   **IVAN** then sent a text message to **LINCOLN** at 8:42 a.m.

91.     Later that morning, at approximately 11:27 a.m., **IVAN** received an incoming call on TT3 from CHUY LNU at his -6239 number (TT3 Ref. # 354). During the call, **IVAN** told CHUY LNU, "Hey, look we are here in the T now and this guy is all set now as well."   CHUY LNU then asks, "Oh, you already saw him too. Did he give you . . . he was going to give you sixteen." **IVAN** then responds, "Yes, sixteen and a half."   Based on my training, experience, and knowledge of the investigation I believe that in this conversation, CHUY LNU was inquiring of **IVAN** whether he had made the five-kilogram delivery to **LINCOLN** and the half-kilogram delivery to the unknown Tulsa customer, to which **IVAN** affirms.

92.     Later that night, at approximately 5:14 p.m., **IVAN** placed another outgoing call to CHUY LNU at his -6239 number (TT3 Ref. # 367).  **IVAN** tells CHUY LNU that "we just finished up with the truck."   CHUY LNU then tells

**IVAN** to ask **JULIA** for "eight six hundred so you can give it to [her]." **IVAN** then asks what about the "four hundred" that were given the previous day on October 19, 2021. **IVAN** and CHUY LNU both then confirm that the "eight six hundred" plus the "four hundred" comes out to "nine pesos." Based on my training and experience and knowledge of the investigation in this call, I believe **IVAN** first tells CHUY LNU that he had finished putting the Dodge Dakota back together and then confirms the amount of money to be given to **MORALES** for transportation fees. CHUY LNU advises that **IVAN** should get $8,600 ("eight six hundred") from his mother to complete the payment of $9,000 to **MORALES**.

93.   In response, law enforcement once again established surveillance at the Hampton Inn and Suites located at 920 SW 77th St. where **IVAN** had picked up the Dodge Dakota on the previous day. At approximately 7:05 p.m., the pole cam at the Indiana Residence captured the Dodge Dakota departing the residence. At approximately 7:13 p.m., law enforcement observed the Dodge Dakota arrived at the Hampton Inn and Suites. At approximately 7:19 p.m., law enforcement observed **MORALES** exit the front doors of the hotel and walk toward the Dodge Ram that was driven to the hotel by **IVAN**. Law enforcement then observed a hand-to-hand transaction between **IVAN** and **MORALES** before **IVAN** left in his Dodge Ram.

94.   DEA eventually confirmed that **MORALES** was the individual **IVAN** had met with by serving an administrative subpoena on the Hampton Inn

73

and Suites.  The hotel confirmed that an individual who provided the name of "Nancy Moreales," with an address of 749 W 3900 S Riverdale, had checked into the hotel on October 19, 2021.  Based on law enforcement's investigation, this address appears to be fictitious, which I know based on my training and experience is a common method employed by drug traffickers in order to avoid detection by law enforcement.

95.     To sum, based on my training, experience, and knowledge of the investigation, I believe that **MORALES** drove from Mexico into the United States on October 19, 2021, in her Dodge Dakota truck transporting five kilograms of cocaine.  She then left that truck at the Hampton Inn and Suites for **IVAN**, who drove it to the house on Indiana Ave., where he dismantled the dash board in order to retrieve the five kilograms of cocaine out of the vehicle. Once he had retrieved those five kilograms, he proceeded on October 20 to deliver those five kilograms to **LINCOLN** in Arkansas and another half-kilogram of cocaine to UM0460 in Tulsa. In addition to the calls and surveillance described above, law enforcement later received further corroboration that this is precisely what had taken place.  For example, following his arrest on October 26, 2021, **IVAN** granted consent for the search of his phone, TT3.  Law enforcement then recovered data from TT3, including photographs dated October 19, 2021, that show **IVAN** with a dismantled dashboard of a vehicle in the garage of the Indiana Residence.  Furthermore, the Indiana Ledgers confirm the October 20 deliveries to **LINCOLN** in Arkansas and

74

UM0460 in Tulsa.  As shown below, a half-kilogram of cocaine was sold in "T" (Tulsa) on October 20, 2021, for $16,500—just as **IVAN** had told CHUY LNU. Further, $9,000 was then subtracted for transportation fees for "5 F" (five *finas*, or five kilograms of cocaine) to the person driving the "Ram Negro."  (While **MORALES** was driving a black Dodge Dakota truck—not a black Dodge Ram—I believe this was likely an oversight.)  The $9,000 noted in the Indiana Ledgers is also consistent with the "9 pesos" that **IVAN** and CHUY LNU discussed.  A separate page of the ledger also notes that "5" (kilograms of cocaine) was delivered to Arkansas by **IVAN** and **AARON** and another "½" (kilogram of cocaine) was delivered to the "T" (Tulsa), both on October 20, 2021.





96.     As shown, **LOPEZ**, was a regular customer of the DTO.  In fact, the

ledgers from the Indiana Residence documented numerous deliveries by the DTO

to **LOPEZ**.  For example, the Indiana Legers showed a $20,000 payment made by

**LOPEZ** ("Mono") on July 21, 2021.



Another entry, this time for October 14, 2021, showed that **LOPEZ** paid **MONO**

paid **JULIA** $57,000 total for two kilograms of cocaine



97.     On October 20, 2021, law enforcement executed a search warrant at

**LOPEZ's** residence.   In total, law enforcement recovered approximately 3.5

kilograms of a substance that field tested positive for cocaine.   Approximately half

of a kilogram was found in a clear plastic bag on the dresser inside the master

bedroom next to $9,055 in cash.   In a floor safe located in the master bedroom

closet, law enforcement located three kilograms of cocaine, two loaded firearms,

and $14,900 in cash.   There was also other cash ($147), an AK-47 75-round drum

magazine, various magazines, ammunition, and gun holsters, among other things,

found throughout the residence.

98.     The next day, October 21, 2021, at approximately 11:22 a.m., **IVAN**,

using TT3, placed an outgoing call to an unknown male (UM0190) at telephone

number (918) 693-0190 (TT3 Ref. # 385).   During the call, UM0190 asks **IVAN**,

"Uh, I was going to ask you, have the waters arrived yet?"  **IVAN** confirms they

have, explaining, "Yes, I…in fact, I was talking with this man in the morning and

he already confirmed that it'll be done on…it'll be here Saturday or Sunday as the

latest." UM0190 says, "Cool, cool, okay, okay so I can let my people know and bear with me, bear with me for a little bit and I'll let you know who much is there because there's something there as well." **IVAN** replies, "Oh okay, yeah, if you want, we can leave it for when I take that, what do you think?" UM0190 agrees, "Yes, we'll do it like that, we'll do it like that." The call then concludes.

99.    Based on my training, experience, and knowledge of the investigation, I believe that in the above call, UM0190, whom law enforcement knows to be a Tulsa-based customer of the DTO, is asking **IVAN** when the new shipment of methamphetamine (the "waters") will arrive. **IVAN** tells UM0190 that the new shipment of methamphetamine has not arrived yet, but that he expects it to arrive either Saturday or Sunday at the latest. UM0190 responds and says that he will let his customers know.

100.   It appears that the shipment of drugs that the DTO was waiting on finally arrived the morning of October 26, 2021. That morning, law enforcement established surveillance in the vicinity of the Indiana Residence, where they observed **JULIA's** gray Chevrolet Cruze parked in the driveway.   At approximately 8:40 a.m., officers observed **IVAN's** Dodge Ram arrive at the Indiana Residence.  Shortly thereafter, officers observed a Hispanic male come from the direction of the Indiana Residence, retrieve a large black duffle bag from the Dodge Ram, and bring it into the Indiana Residence.  Then, at approximately 10:00 a.m., officers observed a Hispanic male come from the direction of the

Indiana Residence carrying a large black duffle bag. The Hispanic male then placed it inside **IVAN's** Dodge Ram. Moments later, officers observed the Dodge Ram depart the Indiana Residence. Law enforcement maintained surveillance on the Dodge Ram after it left the Indiana Residence and headed north on Interstate 35.

101. At approximately 10:30 a.m., law enforcement observed the Dodge Ram, still traveling north on Interstate 35, commit a traffic violation for improper lane use and unsafe lane change. Law enforcement then conducted a traffic stop on the Dodge Ram truck on Interstate 35, just south of E. Wilshire Blvd. Upon making contact with the occupants of the vehicle, law enforcement identified **AARON** as the driver and the two other occupants as **JULIA** and **IVAN**. None of the occupants of the vehicle could produce a United States driver's license, at which point law enforcement temporarily detained the occupants. Law enforcement then deployed two Oklahoma state-certified canines to conduct free air sniffs of the Dodge Ram for narcotic odors. Each canine was deployed separately and independently of one another. Both canines positively alerted to their respective law enforcement handlers, indicating the presence of narcotic odor emanating from the Dodge Ram.

102. Law enforcement then conducted a probable cause search of the vehicle. In the bed of the Dodge Ram, law enforcement found a black duffle bag containing cellophane wrapped bundles. In total, there were twenty-three

79

bundles.  Twenty of these bundles were wrapped in green cellophane.  Two bundles were wrapped in black tape, and one bundle was wrapped in a food saver bag.  A field test of a randomly chosen green-wrapped bundle yielded a positive result for methamphetamine.  A field test of one of the two bundles wrapped in black tape field yielded a positive result for cocaine.  Lastly, a field test of the bundle in the food saver bag yielded a positive result for cocaine.  The final aggregate weight of the methamphetamine 22.85 gross kilograms and the final aggregate weight of the cocaine was 3.28 gross kilograms.

103.   All three individuals were arrested and transported to the DEA OCDO for processing and interviews.  **IVAN** was read his Miranda rights and agreed to speak with investigators.  During his Mirandized interview, **IVAN** admitted that he left the Indiana Residence with the methamphetamine and cocaine to deliver those drugs to an unidentified customer in Tulsa, Oklahoma.  Further, **IVAN** stated that in the Indiana Residence there would be approximately $40,000 in drug proceeds.

104.   In response to this information, law enforcement obtained and executed a search warrant for the Indiana Residence.  During the execution of that warrant, law enforcement seized approximately 9.5 kilograms of cocaine, 4 kilograms of methamphetamine, two firearms, and approximately $192,692.42 from the Indiana Residence.

105.   In the hallway between the kitchen and the bedrooms of that

residence, law enforcement located a Barret 50 caliber rifle bearing serial number AA012742. They also located a Colt 1911 handgun bearing serial number CJA42228 in the coat closet near the front door.

106.   In the garage of the residence, investigators located a cardboard box with a duffle bag in it.  In the duffle bag investigators located four packages of a crystal-like substance with an approximate field weight of 5,772 grams.  A field test yielded a positive result for methamphetamine.  In the box that contained the duffle bag, investigators located 9.5 hard brick-style packages that had an approximate field weight of 11,099.9 grams and which field tested positive for cocaine.

107.   Law enforcement also recovered detailed drug ledgers (the Indiana Ledgers) throughout the residence, including in the hallway closet, in a rubber tote in the kitchen, and on the kitchen table.   The ledgers also contained information on rent and bill payments under the label "49th"—which I believe refers to 1108 SW 49th, Oklahoma City, Oklahoma, which the investigation had previously identified as a stash house for the DTO.

108.   In the kitchen of the residence, investigators located approximately $61,696 in the same rubber tote that contained the ledgers; law enforcement also recovered approximately $116,000 of bulk cash in a closet and approximately $14,996.42 in the bedroom.  Nearly all of this currency was vacuum-sealed, which I believe based on my training and experience is indicative of bulk cash smuggling.

81

109. In the garage of the residence, investigators observed and photographed several different bags and boxes containing laundry detergent that produced an overwhelming odor throughout the residence.  As law enforcement counted the bulk currency, they noticed this odor was emitted from the vacuum-sealed currency.  Based on my training and experience, I believe this was deliberately placed on the currency in an attempt to mask the odor to avoid detection by any law enforcement K-9, a common method used by drug trafficking organizations.

110. The Indiana Residence contained two bedrooms loaded with clothing items, shoes, hats, and daily essentials.  Throughout the residence, investigators observed mail and identification items linking **JULIA**, **IVAN**, and **AARON**.

111. Based on calls intercepted over TT4 on October 26, 2021, **PEREZ-CAMACHO's** investigators believe that news of **AARON**, **IVAN**, and **JULIA's** arrest earlier that day had reached **PEREZ-CAMACHO**.  For example, at approximately 4:52 p.m. **PEREZ-CAMACHO**, using TT4, placed an outgoing call to Juan Lopez Carreon (**LOPEZ-CARREON**) at telephone number (405) 764-3957 (TT4 Ref. # 1497). During this conversation, **JUAN** advises **PEREZ-CAMACHO** that **ROY** wanted him to pick up "70 pesos" at "Julia's house." **PEREZ-CAMACHO** then tells **LOPEZ-CARREON** that law enforcement would be hitting that house because they (**JULIA** and her sons) had everything under that "house's name." **PEREZ-CAMACHO** then tells **LOPEZ-CARREON** that

**CHUY** had asked him to find someone to go pick up the "work" at "49th" and that "Golo" (**DOMINGUEZ**) knew its location.  **LOPEZ-CARREON** asked if that would be more difficult, and **PEREZ-CAMACHO** said no, because nobody knew about the house on 49th.

112.   Based on my training, experience, and knowledge of the investigation, I believe that in this call, **PEREZ-CAMACHO** was asking **LOPEZ-CARREON** to go pick up $70,000 ("70 pesos") that would be at the Indiana Residence.  He also tells **LOPEZ-CARREON** that CHUY LNU needed someone to go pick up drugs (the "work") from the 49th St. Residence and that would be less risky.  I believe that the DTO was attempting to move cash from **JULIA's** house on Indiana Ave. and drugs from the house on 49th St.—which **PEREZ-CAMACHO** did not believe law enforcement knew about.

113.   It appears that the DTO attempted to do just that.  While executing the search warrant at the Indiana Residence, law enforcement had observed a dark colored Jeep Grand Cherokee in the vicinity of the Indiana Residence, which was notable because law enforcement had previously identified a dark colored Jeep Grand Cherokee belonging to **ROY**.  Moments later, law enforcement observed **ROY's** dark colored Jeep Grand Cherokee bearing Oklahoma License plate SRT-ROY park on the street in the area of 1108 SW 49th Street.  Shortly thereafter, law enforcement observed an individual wearing an orange shirt, later identified as **ROY**, and a second Hispanic male, walk to the front porch of 1108

83

SW 49th St.  Law enforcement then observed both individuals walk around to the rear of the residence. Not long after, at approximately 7:09 p.m., law enforcement observed **ROY** and the other Hispanic male walk back to the Jeep Grand Cherokee and depart. Law enforcement, however, was unable to maintain surveillance on **ROY's** Jeep Grand Cherokee. Around the time **ROY** and the other Hispanic male had left the 49th St. Residence, Oklahoma City Police Department (OCPD) dispatch received a call reporting that a subject was attempting to break into the 49th St. Residence and that the subject departed in a Jeep Grand Cherokee.

114.   At approximately 7:15 p.m., OCPD then responded to the 49th St. residence and observed the back windows broken out of the residence. While conducting a protective sweep of the residence to determine that no individuals were inside, law enforcement observed pallet jacks propped on the rear door, a safe in a closet, and a rifle box.

115.   Law enforcement was able to eventually locate **ROY's** Jeep Grand Cherokee at **DOMINGUEZ'S** residence at the Hillcrest Apartments, located at 1402 SW 59th Street, Oklahoma City, Oklahoma. At approximately 7:50 p.m., law enforcement observed **ROY** and **DOMINGUEZ** exit the apartments and enter **DOMINGUEZ's** Chevrolet Cruze and depart the apartment complex. Surveillance was maintained on the Cruze. Then, at approximately 8:02 p.m., law enforcement observed the Cruze arrive at the 49th St. Residence. Law

84

enforcement then observed an individual exit the Cruze and walk towards the front door next to the 49th St. Residence. Shortly thereafter, the individual walked back towards **DOMINGUEZ's** Cruze, and the vehicle departed the area.

116. Not long after, at approximately 8:09 p.m., law enforcement conducted a traffic stop in the area of the 49th St. residence on the Cruze for a traffic violation. The occupants of the vehicle were identified as **ROY** and **DOMINGUEZ**. Police issued a warning to the two occupants and they were released from the scene without incident.

117. Based on calls over TT4, it appears that **LOPEZ-CARREON** and **ROY** had in fact attempted to break into the 49th St. residence earlier that night and that **ROY**, in a second attempt with **DOMINGUEZ**, had attempted to return to the house to retrieve the DTO's stash of drugs. At approximately 8:25 p.m. that night, **PEREZ-CAMACHO** used TT4 to place an outgoing call to **LOPEZ-CARREON** (TT4 Ref. # 1522.) During the call, **LOPEZ-CARREON** tells **PEREZ-CAMACHO** that he (**LOPEZ-CARREON**) and **ROY** had gone to the house on 49th St. but had left after a neighbor heard **LOPEZ-CARREON** breaking a glass. **LOPEZ-CARREON** stated that he was no longer with **ROY**.

118. Then, roughly fifteen minutes later, at approximately 8:40 p.m., **PEREZ-CAMACHO** made another call to **LOPEZ-CARREON** (TT4 Ref. # 1523). During the call, **PEREZ-CAMACHO** tells **LOPEZ-CARREON** that "Chuy" told him that **ROY** had been stopped by the police. **LOPEZ-CARREON**

85

then explains that after they (he and **ROY**) had left the house, **ROY** wanted to go again, but **LOPEZ-CARREON** did not want to go because his hand was cut from the broken glass. **LOPEZ-CARREON** continued, explaining that **ROY** had wanted to return to the house to pick up the "devices" and that he had taken "Golo" (**DOMINGUEZ**) with him.

119. Based on my training, experience, and knowledge of this investigation, I believe that the events described above further corroborate that the DTO was using 1108 SW 49th as a stash house, and that **ROY** and **LOPEZ-CARREON** had first attempted to break into the stash house but had left after a neighbor heard them breaking glass. This was consistent with the 911 call that OCPD dispatch received. I also believe that **ROY** and **DOMINGUEZ** then returned to the house one more time, presumably because they had not been able to move drugs out of the 49th St. residence during their first attempt. That it had been **ROY** and **DOMINGUEZ** that had attempted to return to the house the second time seems to have been corroborated by law enforcement's identifying both men after they pulled **ROY's** vehicle over for a traffic violation, as well as the call described above.

120. Late that evening, law enforcement obtained a search warrant for the 49th St. Residence. In the southeast bedroom of the 49th St. Residence, law enforcement located one package, wrapped in black tape, that contained a black tar-like substance, consistent with the appearance of heroin. This substance had

86

an approximate field weight of 1,462.1 grams.  Investigators attempted to field test the package for heroin, but the field test results were inconclusive.[21]  In the northeast bedroom of the 49th St. Residence, law enforcement recovered a plastic bag containing a white powder substance, which had an approximate field weight of 1,126.7 and which field tested positive for cocaine.

121.    Throughout the kitchen of the 49th St. Residence, investigators located several varieties of plastic wrap or "skins" that appeared to have been used to package drugs at some point.  In several of these "skins" there were remnants of a crystal-like substance that field tested positive for methamphetamine.

122.    In the living room of the residence, law enforcement observed several empty firearms boxes that were associated with handguns and high-end rifles. Based on this, I believe that the 49th St. residence was being used to traffic firearms.  The 49th St. Residence also contained items of dominion and control for **JULIA**, **IVAN**, and **AARON**.  Law enforcement located a Mexican passport and mail addressed to **JULIA**, as well as plane tickets for **AARON** and fake identification cards for both **AARON** and **IVAN**.

---

[21]    Along with the other drugs seized during the investigation, this package has been sent to a DEA lab for further testing.

## CONCLUSION

123.   Based on training and experience, and the foregoing information, I submit that there is probable cause to believe that Maria Julia Baeza-Medrano, a/k/a "La Tia" (**JULIA**), Jesus Ivan Baeza-Medrano, a/k/a "Polaco" (**IVAN**), Carlos Aaron Baeza-Medrano (**AARON**), Alexis Perez-Camacho, a/k/a "Cholo" (**PEREZ-CAMACHO**), Jose Ramon Dominguez, a/k/a "Golo" (**DOMINGUEZ**), Juan Luis Lopez-Carreon, a/k/a "El Licenciado" (**LOPEZ-CARREON**), Juan Soto, a/k/a "El Güero" (**SOTO**), Ivan Roy Gonzalez-Hernandez, a/k/a "Roy" (**ROY**), Kevin Perez-Camacho (**KEVIN**), Andrea Marie Alvarez (**ALVAREZ**), Josue Israel Lopez, a/k/a "Mono" (**LOPEZ**), Omar Joseph Lincoln (**LINCOLN**), Lavern Thomas (**THOMAS**), Nancy Morales (**MORALES**), Cesar Omar-Meraz (**OMAR-MERAZ**), and Diego Loya-Najera (**LOYA-NAJERA**), knowingly and intentionally conspired together, along with persons both known and unknown, to possess with intent to distribute intent to distribute controlled substances, including 5 kilograms or more of a mixture or substance containing a detectable amount of cocaine and 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, both being Schedule II controlled substances, in violation

of 21 U.S.C. § 846.  It is therefore requested that arrest warrants be issued for

the offense listed above.

_____

TYLER T. RAWDON
Special Agent, DEA

Sworn and subscribed before me this 28th day of November 2021.

_____

SHON T. ERWIN
United States Magistrate Judge

89